UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC., <br><br> Plaintiff, <br><br> v. <br><br> HALOMD, INC., HOSPITALIST MEDICINE PHYSICIANS OF GEORGIA – TCG, PC, HOSPITALIST MEDICINE PHYSICIANS OF GEORGIA – TCS, PC, AND SOUND PHYSICIANS EMERGENCY MEDICINE OF GEORGIA, P.C., <br><br> Defendants. | Case No: <br><br> COMPLAINT <br> DEMAND FOR JURY TRIAL |

Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. ("BCBSGA") submits the following Complaint against HaloMD, Inc. ("HaloMD"), and Hospitalist Medicine Physicians of Georgia – TCG, PC, Hospitalist Medicine Physicians of Georgia – TCS, PC, and Sound Physicians Emergency Medicine of Georgia, P.C. (collectively, the "Provider Defendants," and together with HaloMD, the "Defendants"):

## **INTRODUCTION**

1.     BCBSGA brings this action against the Provider Defendants and their third-party biller, HaloMD, for conspiring and executing a scheme to steal millions of dollars from BCBSGA, employer plan sponsors, and other Blue Cross and Blue Shield companies by flooding the federal No Surprises Act's ("NSA")

independent dispute resolution ("IDR") process with thousands of knowingly ineligible disputes against BCBSGA.

2.     Defendants' coordinated scheme involved (1) using the interstate wires to submit knowingly false attestations of eligibility for services and disputes that they know are ineligible for the IDR process, (2) strategically initiating massive volumes of IDR disputes simultaneously against BCBSGA, and (3) improperly maximizing payments on ineligible disputes with outrageous payment offers that far exceed what the Provider Defendants could have received from patients or health plans in a competitive market and sometimes even exceed the Provider Defendants' billed charges.

3.     Through this scheme, Defendants procured improper payments from BCBSGA on thousands of disputes. Indeed, nearly *70%* of disputes on which Defendants received an IDR payment determination were clearly ineligible for the process. Since 2024, Defendants' scheme has caused millions of dollars in damages, and it continues to harm BCBSGA, employer plan sponsors, and other managed care companies.

4.     Defendants are guilty of violating the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, the Georgia RICO statute, the Georgia Deceptive Trade Practices Act, and the Employee Retirement Income Security Act ("ERISA"), and have committed fraud and theft by deception, among other things. BCBSGA brings this action to recover damages, vacate improperly obtained arbitration awards, enjoin further improper conduct, obtain

other equitable relief, and protect the integrity of ERISA-governed health benefit plans.

## THE PARTIES

5.    BCBSGA is a Georgia corporation with its principal place of business in Atlanta, Georgia. BCBSGA is licensed as a Health Maintenance Organization in Georgia.

6.    Defendant HaloMD, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in San Antonio, Texas. HaloMD solicits and represents physician practices throughout the United States, including in Georgia.

7.    Defendant Hospitalist Medicine Physicians of Georgia – TCG, PC, is a Georgia Professional Corporation. Its principal place of business is 120 Brentwood Commons Way, Suite 510, in Brentwood, Tennessee. Anthony Briningstool is its Chief Executive Officer, Chief Financial Officer, and Secretary.

8.    Defendant Hospitalist Medicine Physicians of Georgia – TCS, PC (together with Hospitalist Medicine Physicians of Georgia – TCG, PC, "HMP"), is a Georgia Professional Corporation. Like Defendant Hospitalist Medicine Physicians of Georgia – TCG, PC, its principal place of business is 120 Brentwood Commons Way, Suite 510, in Brentwood, Tennessee, and Anthony Briningstool is its Chief Executive Officer, Chief Financial Officer, and Secretary.

9.    Defendant Sound Physicians Emergency Medicine of Georgia, P.C. ("SPEMG"), is a Georgia Professional Corporation. Like the other two Provider Defendants, its principal place of business is 120 Brentwood Commons Way, Suite 510, in Brentwood, Tennessee, and Anthony Briningstool is its Chief Executive Officer, Chief Financial Officer, and Secretary.

10.    Upon information and belief, the Provider Defendants are all subsidiaries and/or corporate affiliates of Sound Physicians, which advertises itself as a multi-specialty practice group with "over 4,000 physicians, advanced practice providers, CRNAs, and nurses" that partners with more than 400 hospitals across the United States and manages approximately 6% of all acute medical hospitalizations. *See* https://soundphysicians.com/about/why-sound/.

11.    The Provider Defendants were all incorporated by persons located at 1498 Pacific Ave., Suite 400, in Tacoma, Washington 98402, which is also Sound Physicians' corporate headquarters.

12.    Lindsay Vaughan, Associate General Counsel of Sound Physicians, served as the incorporator for Hospitalist Medicine Physicians of Georgia – TCG, PC and Hospitalist Medicine Physicians of Georgia – TCS, PC, and has signed annual registration forms filed with the Georgia Secretary of State for all three Provider Defendants.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, which gives federal district courts jurisdiction over civil RICO actions. This

Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the No Surprises Act, 42 U.S.C. § 300gg-111, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and because BCBSGA is headquartered in this District and has suffered injury here.

## BACKGROUND

I.     **BCBSGA Administers Healthcare Claims and IDR Proceedings for Members, Plan Sponsors, Government Programs, and BlueCard Plans.**

15.     BCBSGA offers a broad range of healthcare and related plans and services to its plan sponsors and its "members" who enroll in a BCBSGA plan, including fully insured and self-funded employee health benefit plans. BCBSGA processes tens of millions of healthcare claims annually and is responsible for ensuring that claims are paid accurately and in accordance with plan terms.

16.     BCBSGA administers claims and benefits for several different types of healthcare plans relevant to this Complaint.

17.     First, BCBSGA issues and administers fully insured plans, where BCBSGA is the ultimate insurer of the loss, collects premiums, and is financially responsible for any benefits paid out under the plan terms or pursuant to law.

BCBSGA sells fully insured plans either directly to consumers, such as through the federal Healthcare Exchange, or to small or large employer groups who offer coverage to their employees but do not themselves insure the loss under the plan. Fully insured plans are typically subject to state insurance regulation, such as state laws prohibiting surprise billing and mandating payment amounts for certain out-of-network claims.

18.    Second, BCBSGA administers self-funded plans, typically offered by large employers to their employees. These employers self-insure the plan and are financially responsible for any payment of benefits or other losses. Because employers often lack infrastructure to provide health insurance to their consumers, these plans contract with BCBSGA to receive administrative services, such as provider network development, customer service, and claims pricing and adjudication. These plans often delegate authority to BCBSGA to administer the IDR process on behalf of the plans, and the plans typically (though not always) reimburse BCBSGA for any losses resulting from IDR. These plans are generally exempt from state insurance laws, including state surprise billing regulation, unless the plan chooses to opt into the state law. Instead, the plans are subject to ERISA.

19.    Third, BCBSGA administers government program claims, such as through the Medicare Advantage program or Medicaid managed care. Government program claims are exempt from NSA requirements and ineligible for IDR.

20.     Fourth, pursuant to the BlueCard program, BCBSGA acts as a "Host Plan" to other independent Blue Cross and/or Blue Shield "Home Plans" whose members obtain treatment from providers in BCBSGA's service area in Georgia. As Host Plan, BCBSGA manages and participates in IDR proceedings that are initiated by providers in Georgia for BlueCard plans whose members received treatment from the initiating Georgia provider.

21.     While BCBSGA administers different types of health plans, providers generally know what type of health care coverage the patient has. Providers require proof of insurance at the point of service to submit claims to the health plan, and the member's health insurance card identifies the nature of the member's coverage. BCBSGA will also issue an explanation of payment ("EOP") to the provider that typically provides coverage information for the member, among other information.

## II.     Before the NSA, Out-of-Network Physicians like the Provider Defendants Exploited American Consumers with Surprise Medical Bills.

22.     Health plans like BCBSGA contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Generally, patients receive better and more affordable health care coverage when receiving treatment from these "in-network" providers, since they have a contract with their health plan that governs the rate for the relevant services and that prohibits them from billing patients above that amount. Patients can choose to obtain treatment from out-of-network providers,

which have no contract with their health plan, but typically, the care from out-of-network providers is more expensive.

23.     In some situations—such as in cases of a medical emergency, when the patient is seeking treatment at an in-network hospital, or air ambulance transports—patients have limited ability to select an in-network provider. Before passage of the NSA, certain out-of-network providers, such as emergency medicine providers like the Provider Defendants, air ambulance providers, critical care providers, pathology providers, intraoperative neuromonitoring ("IONM") providers, and radiology providers, capitalized on patients' lack of meaningful choice in these situations.

24.     Prior to the enactment of the NSA, these types of out-of-network providers widely engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, the providers would exploit patients' lack of choice in selecting an in-network provider and bill the patient for the difference between their "inflated," "non-market-based rates"—known as "billed charges"—and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57.

25.     Surprise billing was particularly rampant among privately funded physician groups like the Provider Defendants. For instance, a company affiliated with the Provider Defendants was publicly called out in the press for balance billing patients who chose to visit an in-network hospital for emergency services but received an unexpected and very large medical bill because the physician who

provided their emergency care was out-of-network with their insurance. *See* C. Nylander, *N4T INVESTIGATORS: Sierra Vista patients claim they were overbilled by physicians' group*, News4Tucson (Apr. 20, 2022), available at https://www.kvoa.com/news/n4t-investigators-sierra-vista-patients-claim-they-were-overbilled-by-physicians-group/article_e4321afc-c104-11ec-80f8-ab2a3169ad18.html (last visited May 25, 2025).[1]

26.    Surprise billing providers like the Provider Defendants held "substantial market power" and "face[d] highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care." Thus, surprise billing providers like the Provider Defendants could "charge amounts for their services that … result[ ] in compensation far above what is needed to sustain their practice." H.R. Rep. No. 116-615, at 53. Because surprise billing providers like the Provider Defendants could reap massive profits by issuing surprise medical bills to patients, they had little incentive to contract with health plans like BCBSGA and offer more affordable health care services to American consumers.

27.    Congress recognized that this dynamic created a "market failure" for surprise billing providers like the Provider Defendants. *See* H.R. Rep. No. 116-

---

[1] Balance billing is not the only bad conduct in the Provider Defendants' history—in 2013, the Department of Justice ordered another affiliate based in Washington to pay $14.5 million for overbilling Medicare and other federal healthcare programs. *See* Press Release, *Bills Claimed Higher Level of Service Than Was Documented*, Dep't of Justice (July 3, 2013), available at https://www.justice.gov/archives/opa/pr/tacoma-wash-medical-firm-pay-145-million-settle-overbilling-allegations (last visited May 25, 2025).

615, at 53, 57. And the "market failure" created by surprise billing providers was having "devastating financial impacts on Americans and their ability to afford needed health care." H.R. Rep. No. 116-615, at 52. In an attempt to resolve these problems, Congress enacted the NSA.

**III.     The No Surprises Act Curbed Abusive Surprise Billing Practices.**

28.    Congress enacted the NSA, effective January 1, 2022, "to protect consumers from surprise medical bills." H.R. Rep. No. 116-615, at 47 (2020). The NSA protects consumers by banning certain out-of-network health care providers, including emergency services providers and facilities, providers of non-emergency services operating at in-network facilities, and air ambulance services, from engaging in surprise billing. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. To be subject to the NSA and IDR, healthcare services must follow into one of these three categories and meet other statutorily and regulatory requirements described below.

29.    When enacting the NSA, Congress also found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the NSA creates a separate framework outside the judicial process for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations, (2) an IDR process for "qualified IDR items and services," and (3)

if applicable, a binding payment determination from private parties called certified IDR entities ("IDREs") with limited judicial review.

### A.    Open Negotiations

30.    As a prerequisite for participating in the IDR process, the initiating party must first initiate and participate in "open negotiations" with the health plan. 42 U.S.C. § 300gg-111(c)(1)(B).

31.    When a health plan receives a claim for out-of-network services subject to the NSA (*i.e.*, emergency services, services provided at an in-network facility, or air ambulance services), the health plan will make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). The health plan's EOP includes, among other information, a phone number and email address for providers to seek further information or initiate open negotiations. *See* 45 C.F.R. § 149.140(d)(2).

32.    If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day open negotiations period. *See id.*

### B.    The IDR Process for Qualified IDR Items and Services

33.    If the provider initiates and exhausts the 30-day open negotiations period, and "the open negotiations … do not result in a determination of an amount of payment for [the] item or service," then the provider may initiate the IDR process. 42 U.S.C. § 300gg-111(c)(1)(B); *see* 45 C.F.R. § 149.510(b)(2)(i). The IDR process is only available to providers who first initiate and exhaust open negotiations with the health plan. *See id.* Providers must initiate the IDR process within 4 business days after the open negotiations period has been exhausted. *See id.*

34.    The IDR process is also only available for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service within the scope of the IDR process, the following conditions must be met:

a.    The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services, and also of a coverage type subject to the NSA (*e.g.*, not government programs like Medicare or Medicaid);

b.    A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

c.    The underlying services were covered by the patient's health benefit plan (*i.e.*, payment was not denied);

d.    The patient did not waive the NSA's balance billing protections;

e.    The provider initiated and exhausted open negotiations;

    f.   The provider initiated the IDR process within 4 business days after the open negotiations period was exhausted; and

    g.   The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

35.    Relevant to state surprise billing laws, which impact eligibility for IDR, the NSA defines a specified state law as "a State law that provides for a method for determining the total amount payable under such a plan, coverage, or issuer, respectively … in the case of a participant, beneficiary, or enrollee covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility." 42 U.S.C. § 300gg-111(a)(3)(I); 45 C.F.R. § 149.30 (same).

36.    The Centers for Medicare & Medicaid Services ("CMS"), the federal agency within the Department of Health and Human Services ("HHS") that is primarily charged with implementing the IDR process, has issued several resources to aid interested parties in determining whether a state surprise billing law exists. *See*, *e.g.*, CAA Enforcement Letters, available at https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/consolidated-appropriations-act-2021-caa (last accessed May 19, 2025); Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process (Jan. 13, 2023), available at

https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf (last accessed May 19, 2025).

37.    Georgia has a specified state law called the Surprise Billing Consumer Protection Act, codified at O.C.G.A. § 33-20E-1, *et seq*.; *see* Georgia CAA Enforcement Letter (Dec. 13, 2021), available at https://www.cms.gov/cciio/programs-and-initiatives/other-insurance-protections/caa-enforcement-letters-georgia.pdf (last accessed May 24, 2025). For out-of-network emergency services and non-emergency services at in-network facilities, this law requires payment at the greatest of: (1) the verifiable contracted amount[2] paid by all eligible health plans subject to the statute for the same or similar services, as reflected in the Georgia All-Payer Claims Database; (2) the most recent verifiable amount agreed to by the health plan and the nonparticipating provider for the provision of the same or similar services; and (3) any higher amount the health plan deems appropriate given the complexity of the circumstances. *See* O.C.G.A. §§ 33-20E-4(b)(1)–(3), 33-20E-5(b)(1)–(3); Ga. Comp. R. & Regs. r. 120-2-106-.05(2)(a)–(c); *see also* Ga. Comp. R. & Regs. r. 120-2-106-.09 (reflecting establishment of the All-Payer Claims Database). Georgia also provides for its own dispute resolution mechanism if the provider is

---

[2] The "contracted amount" is defined as the median in-network amount paid during the 2017 calendar year by an insurer for the emergency or nonemergency services provided by in-network providers engaged in the same or similar specialties and provided in the same or nearest geographical area, adjusted for inflation annually. O.C.G.A. § 33-20E-2(b)(2).

dissatisfied with payment. *See* O.C.G.A. § 33-20E-9; Ga. Comp. R. & Regs. r. 120-2-106-.10.

38.    Finally, the NSA imposes certain other requirements for services submitted to IDR in addition to the fact they are qualified IDR items or services. For example, when a party submits multiple separate services to different patients in a single dispute, they must comply with the NSA's "batching rules." These require that the services be rendered to members of the same insurer or self-funded health plan during a 30-business-day period by the same provider and for treatment of the same or similar medical condition. *See* 42 U.S.C. § 300gg-111(c)(3)(A). Further, parties are prohibited from initiating IDR disputes involving the same parties and items or services during a 90-day period following an IDR determination, also known as the "cooling off period." *See id*. at § 300gg-111(c)(5)(E)(ii).

39.    When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process. *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-

initiation.pdf. A copy of the IDR initiation form, including the attestation, are provided to the non-initiating party, the IDRE, and the Departments.[3]

**C.    The IDR Initiation Process Notifies Parties of Facts That Render Disputes Ineligible.**

40.    Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/.

41.    The online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services.

42.    At each step of the process, the submitting party must answer "Qualification Questions" through the online form. If the answers to those questions indicate that the dispute is not eligible for IDR, the form will provide an alert and not allow the submission to proceed.

43.    The first page of the website specifies that parties may "[u]se this form if you participated in an open negotiation period that has expired without agreement for an out-of-network total payment amount for the qualified IDR item or service."

---

[3] The "Departments" include Health and Human Services ("HHS"), the Department of Labor ("DOL,") and Treasury.

Use this form if you participated in an open negotiation period that has expired without an agreement for an out-of-network total payment amount for the qualified IDR item or service.

You can start the Federal Independent Dispute Resolution (IDR) process within 4 business days after the end of the 30-business-day open negotiation period if a determination of the total payment for the qualified IDR item(s) or service(s), including cost-sharing, wasn't reached.

You will need to **provide information for both parties involved** in the dispute.

44.    The first page also provides a link to a list of states with specified state laws that may render the dispute ineligible for the IDR process:

Review the IDR State list to determine which states will have processes that apply to payment determinations for the items, services, and parties involved. FEHB plans are subject to the Federal IDR process unless OPM contracts with FEHB carriers to include terms that adopt state law as governing for this purpose.

45.    Before initiating the IDR process, parties must agree to certain terms and conditions. The terms and conditions include a notice that the initiating party must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

**Before starting:**
You may need to provide information by uploading separate documents. The total file size limit for all uploaded documents is 500MB. Be sure your files meet this limitation.

Along with the general information you'll need to start your Federal IDR dispute process, provide:
- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

46.    After agreeing to the terms and conditions, initiating parties must answer certain Qualification Questions.

47.    The first page of the Qualification Questions asks whether the service in question was provided prior to January 1, 2022. If the initiating party answers "yes," an alert appears stating, "This dispute is not eligible for the federal IDR process because the date of service you provided is before 1/1/2022." If the initiating party answers "no," it must select what type of organization it is from a

list. If the initiating party is (or acting on behalf of) a health care provider, it must

enter a Tax ID number and a National Provider Identifier (NPI) for the provider

and select the type of health plan that covers the services in dispute from a pre-

populated list (*e.g.*, individual health insurance issuer, fully insured private group

health plan, self-insured private (employer-based) group health plan, etc.).



48.     If the initiation is not within 4 business days of the end of the 30-day

open negotiation period, the initiating party must provide a reason why they are

eligible for an extension and provide supporting documentation.

49.     In addition, the initiating party must note whether the health care provider received consent from the beneficiary to waive surprise billing protection. If the answer is "yes," the initiating party will be alerted that the "dispute is not eligible for the federal IDR process," which will prevent the party from proceeding with the initiation process.

* **(required)** Did the health care provider or health care facility get consent from the participant, beneficiary, or enrollee to waive surprise billing protections for these items or services?

○ Yes
○ No

50.     After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation. The submitting party must provide a variety of relevant information, including the name and contact information of the health care provider, the claim number, the date of the service, the QPA, the qualified IDR item or services at issue, and documentation supporting these facts.

51.     At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."

> \* (required) ☐   I, the undersigned initiating party (or representative of the initiating party), at-test that to the best of my knowledge the preferred certified IDR entity does not have a disquali-fying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **\* (required)** Initiating party (or representative of the initiating party):
>
> [ Print Name ]
>
> **\* (required)** Date:
>
> [ 05/23/2025 ]

[ Exit ] | [ Back ]     [ Submit ]

52.    A copy of the Notice of IDR Initiation—including the initiating party's attestation that that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—is provided to the non-initiating party (*i.e.*, the health plan), the IDRE, and the Departments.

53.    At every stage of this online process, the initiating party must make false statements to submit a dispute for services that are not eligible for IDR, or the process cannot continue. As such, when a party initiates the IDR process, it has full knowledge of the requirements and limits of the IDR process.

54.    HHS administers the IDR initiation process. Any submission made through this system is a statement made to the Federal Government, and any attestation made as part of the submission process is also made to the Federal Government. False attestations to the Federal Government violate 18 U.S. § 1001.

### D. If Applicable, IDREs Make Binding Payment Determinations with Limited Judicial Review

55.     After the provider initiates the IDR process, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). The IDRE performs two tasks.

56.     *First,* the IDRE is required by regulation to "determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). In making the determination that the IDR process applies, the IDRE is directed to "review the information submitted in the notice of IDR initiation" with the provider's attestation of eligibility. 45 C.F.R. § 149.510(c)(1)(v). In practice, this is a cursory review by the IDRE based on incomplete information and rife with errors due to the systemic overwhelm from the high volume of disputes.

57.     *Second*, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A).

58.     IDR payment determinations resemble a baseball-style arbitration where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

59.     In making its determination, the IDRE must consider the "qualifying payment amount" or "QPA"—typically the health plan's median in-network contracting rate for the services—and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). IDREs cannot

consider, among other things, the provider's charges. 42 U.S.C. § 300gg-111(c)(5)(D) (IDREs "shall not consider … the amount that would have been billed by such provider or facility …"). Congress reasoned that permitting IDREs to "consider non-market-based rates such as the providers' billed charges … may drive up consumer costs." H.R. Rep. No. 116-615, at 57.

60.    The NSA provides that IDR determinations are "binding" unless there was "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]" 42 U.S.C. § 300gg-111(c)(5)(E)(i).

61.    Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee of $115 when the dispute is initiated. This is typically not recoverable even when the IDRE determines that the dispute is not qualified for IDR, or even when the initiating party later voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of IDR submitted, but ranges from $200 to $1,173. The party whose offer is selected by the IDRE is refunded its IDRE fee, meaning it is only responsible for the $115 administrative fee. The non-prevailing party is responsible for both the administrative fee and the IDRE fee.

62.    Notably, IDREs are only compensated when a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). They do not receive

compensation when dismissing a dispute due to the ineligibility of the service. *See id.* And because IDREs are compensated on a per-dispute basis, they receive greater compensation when there are a greater total number of disputes.

63.    The NSA permits judicial review "in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9" of the Federal Arbitration Act ("FAA"). 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). This includes the following:

   a.  where the award was procured by corruption, fraud, or undue means;

   b.  where there was evident partiality or corruption in the arbitrators, or either of them;

   c.  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

   d.  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).

## IV.    HaloMD and the Provider Defendants Conspire to Exploit the NSA's IDR Process and Defraud Health Plans like BCBSGA.

64.    With the passage of the NSA, surprise billing providers like the Provider Defendants could no longer exploit American consumers through surprise medical bills. But by conspiring with third-party billing and revenue cycle companies like HaloMD, the Provider Defendants found a new target to exploit for massive profits: the NSA's IDR process, and by extension, health plans like BCBSGA and its employer plan sponsor customers.

65.     HaloMD solicits and represents many different types of out-of-network providers who were key drivers in surprise billing, including emergency medicine providers, air ambulance providers, critical care providers, pathology providers, IONM providers, and radiology providers. These provider groups, including the Provider Defendants, frequently retain HaloMD to administer the IDR process on their behalf.

66.     HaloMD's website characterizes HaloMD as "the premier expert in Independent Dispute Resolution (IDR)[.] … Our deep expertise, advanced technology, and strategic legal approaches position us as leaders in this space. … [W]e empower out-of-network providers to secure sustainable, predictable revenue streams. Backed by a dedicated team and industry-leading success rates, we deliver the financial outcomes that healthcare providers, practice leaders, and executives rely on for long-term financial stability." *See* https://halomd.com/ (last visited May 19, 2025).

67.     HaloMD touts its "proprietary platform" as one founded with "advanced technology and AI-driven infrastructure[.]" *Id*. HaloMD also represents that it "instantly assesses each case for eligibility under The No Surprises Act and relevant state regulations." Providers submit services for dispute in the IDR process through HaloMD's portal. *See* https://halomd.com/ (last visited May 19, 2025).

68.     HaloMD further represents that it "gathers and organizes the necessary documentation [from the provider], [and] prepar[es] a compelling case

that highlights the provider's position, ensuring nothing is overlooked[.]" *Id.* Upon information and belief, Defendants exchange information and documentation relevant to the disputed services to pursue their exploitation of the IDR process.

69.    HaloMD operates on a commission-based reimbursement model. Its website states: "We don't get paid until you get paid." *Id.* HaloMD thus has a financial incentive to (1) bring as many services as possible through the IDR process, regardless of the merits or the applicability of the NSA to those disputes, and (2) seek the highest possible monetary award for its provider clients in the IDR process. The Provider Defendants share these same financial incentives.

70.    However, HaloMD is not the only party initiating IDR for the Provider Defendants. Rather, many IDRs pursued by the Provider Defendants were initiated by SPEMG through its email address soundfedidr@soundphysicians.com, including for services provided by HMP. The character of IDRs pursued by SPEMG itself (as opposed to this submitted by HaloMD) follow the same pattern of systemic initiation of faulty and ineligible disputes.

71.    The Provider Defendants share resources and intermingle operations with respect to the submission of healthcare claims, payment for healthcare services, and pursuit of IDR. As noted above, SPEMG filed IDR initiations on behalf of HMP. Even in disputes initiated by HaloMD, the email address recorded by the initiating party for IDR involving HMP services is soundnsa@halo.com.

The interchangeable nature and shared control of the Provider Defendants is likewise evident in the fact that BCBSGA's EOPs for HMP services were directed to P.O. Box 748996, Los Angeles, CA 90074-8996—a national Sound Physicians address. *See* Sound Physicians, Patient Resources (listing this address as the address for patient billing and payment information for emergency medicine), available at https://soundphysicians.com/patient-resources/ (last visited May 26, 2025). Open negotiation notices for HMP's services were also sent from this same address.

72.     Thus, the Provider Defendants themselves falsely attested eligibility in many disputes and, through their commingled operations, clearly had knowledge of the broader ongoing illegal scheme.

73.     Defendants' scheme to exploit the IDR process involves three related tactics. ***First***, using interstate wires, Defendants make repeated false representations and attestations of eligibility to the government, the IDREs, and health plans like BCBSGA. ***Second***, Defendants strategically submit massive numbers of open negotiations and IDR initiations—most of which are ineligible for IDR—in an attempt to overwhelm health plans like BCBSGA, IDREs, and the IDR process. ***Third***, after pushing through an enormous number of ineligible disputes using the first two tactics, Defendants capitalize on flaws in the IDR process by submitting—and often prevailing—with outrageous payment offers that they could never receive on the open market, including many that exceed the

Provider Defendants' "inflated," arbitrary, and "non-market-based" charges. *See* H.R. Rep. No. 116-615 (2020), at 53, 57.

A.     **Via Interstate Wires, Defendants Knowingly Make False Attestations of Eligibility to Initiate the IDR Process**

74.    When initiating ineligible disputes against BCBSGA through the IDR process, the Provider Defendants, and HaloMD on behalf of the Provider Defendants, make repeated false attestations and representations that the items or services in dispute are "qualified item(s) and/or service(s) within the scope of the Federal IDR process." *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. DEP'T OF LABOR, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf. Defendants make these false attestations and representations to BCBSGA, the IDRE, and the Departments.

75.    The items and services that Defendants falsely attest are "qualified item(s) and/or service(s) within the scope of the Federal IDR process" are clearly ineligible. For example, Defendants will attest that services rendered to members enrolled in a BCBSGA Medicaid or Medicare plan fall within the scope of the IDR process, even though the NSA is inapplicable to these government programs. Defendants also routinely attest that services are within the scope of the IDR process when Defendants made no attempt to pursue mandatory open negotiations. And Defendants routinely attest that services rendered to members subject to Georgia's state surprise billing laws are within the scope of the IDR

process, even though the first page of the IDR initiation process provides a link to states that have surprise billing laws, and the CMS also publishes charts and other resources to inform providers of the states with surprise billing laws and the scope and applicability of those laws. *See* Notice of IDR Initiation, HHS, available at https://nsa-idr.cms.gov/paymentdisputes/s/; *see, e.g.,* CAA Enforcement Letters, CMS, *supra*; Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process, CMS, *supra*.

76.    Typically, HaloMD makes these false attestations when initiating the IDR process on behalf of the Provider Defendants. In these instances, the Provider Defendants are complicit in the false attestations of eligibility because they engage HaloMD to initiate the IDR process, and they know the services at issue in the disputes are not eligible for the IDR process.

77.    The Provider Defendants also directly submit false attestations when initiating IDR on their own or each other's behalf.

78.    In addition, BCBSGA often notifies HaloMD and/or the Provider Defendants regarding the ineligibility of the items or services at issue in their notice of IDR initiation.

79.    As noted, the online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services. Initiating parties must identify, among other things, the specific date that they initiated open negotiations, the type of health plan coverage for the patient who received the

services, and an affirmative attestation that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process." At every stage of the initiation process, Defendants had to make *affirmative false statements* to proceed with the dispute or the process could not continue for these plainly ineligible services.

80.    For example, by design of the online form, each and every time the Defendants submitted services that for which they had not yet exhausted the 30-day open negotiation period, they had to affirmatively lie in answering this question to effectuate their fraud scheme and get the ineligible service approved. BCBSGA's records reflect that more than 400 disputes involved this very issue, and therefore, Defendants affirmatively lied at least 400 separate times in the IDR initiation forms.

**B.    Defendants Strategically Initiate a Massive Volume of IDR Disputes Simultaneously.**

81.    To push thousands of ineligible disputes against BCBSGA through the IDR process with their false attestations of eligibility, Defendants also initiate a massive number of IDR disputes all at once in an attempt to overwhelm BCBSGA and IDREs.

82.    Overall, the NSA's IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates.

83.    Before the IDR process launched, CMS estimated that parties would initiate about 22,000 IDR process disputes in the first year. *See* 86 Fed. Reg. 55,980, 56,068, 56,070 (Oct. 7, 2021).

84.    The reality has shattered those estimates. The most recent government statistics show that in the first half of 2024, disputing parties—virtually all of whom are providers—initiated 610,491 disputes. *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, Jan. 1, 2024—June 30, 2024*, available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q1-2024-q2.xlsx. This figure from **six months** is nearly **28 times** the volume of disputes that the government originally anticipated **over a full year**.

85.    Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties initiated about 69% of all disputes initiated in the first six months of 2024, and the top three initiating parties initiated about 44% of all disputes during that period. *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, Jan. 1, 2024—June 30, 2024*, CMS, *supra*.

86.    HaloMD is among the three most prolific filers of IDR process disputes. During the first six months of 2024, HaloMD initiated 28,995 disputes through the IDR process—which by itself exceeded the government's original estimate for total annual disputes. That means that HaloMD was initiating an average of more than 160 disputes against health plans **per day**. *See id.*

87.    As between just the Defendants and BCBSGA, HaloMD and the Provider Defendants initiated an average of more than 15 disputes against BCBSGA per day.

88.    But HaloMD and the Provider Defendants did not merely initiate a steady volume of IDR process disputes each day. Instead, Defendants strategically collate and initiate hundreds of IDR process disputes against BCBSGA on the same day, most of which do not involve qualified IDR items or services within the scope of the NSA's IDR process. Frequently, Defendants purposefully make no effort to initiate or pursue open negotiations before initiating a new dispute.

89.    For example, on May 3, 2024, Defendants initiated an astounding 342 separate IDR proceedings against BCBSGA. 279 of the disputes—more than 80%--were not eligible for IDR in the first place. Yet BCBSGA lost in 192 of the disputes, where the IDREs ordered BCBSGA to pay an additional $390,704.69 from what was originally reimbursed, plus $118,754 in fees associated with the IDR process.

90.    Defendants' goal is to interfere with BCBSGA's ability to effectively identify ineligible disputes and submit appropriate payment offers to IDREs and overwhelm the IDREs tasked with making applicability and payment determinations.

91.    Through considerable operational burden and expense, BCBSGA has crafted workflows allowing it to identify most of the unqualified items or

services and notify HaloMD and/or the Provider Defendants during open negotiations that the disputes are not qualified for IDR. Yet despite BCBSGA's objections, most of Defendants' ineligible disputes reach a payment determination due to Defendants' knowingly false attestations of eligibility.

92.    According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"— including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). IDREs also complain that they spend 50% to 80% of their time on eligibility determinations, 88 Fed. Reg. 75,744, 75,753 (Nov. 3, 2023). And they have no incentive to dismiss disputes due to ineligibility because they only receive compensation if a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F).

93.    Thus, when receiving an avalanche of ineligible disputes from Defendants all at once, IDREs frequently rely on Defendants' false attestations of eligibility to reach and issue a payment determination on ineligible disputes.

94.    Since 2024, nearly **70%** of disputes from the Defendants that reached a payment determination are ineligible for the IDR process, often despite objections from BCBSGA.

### C.    Defendants Submit Outrageous Payment Offers to Improperly Maximize Payments on Ineligible Disputes.

95.    To maximize payments for the thousands of ineligible IDRs that Defendants strategically initiated with false attestations of eligibility, Defendants

submit outrageous payment offers that far exceed what the Provider Defendants could ever receive for their services from patients or from health plans in a competitive market. Indeed, the payment offers sometimes even exceed the Provider Defendants' billed charges. Due to systemic issues with the IDR process, Defendants frequently prevail with their unreasonable payment offers.

96.     Congress directed IDR payment determinations to be made according to the QPA and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). In practice, however, IDRE payment determinations skew heavily in favor of providers and heavily in excess of the QPA.

97.     In the most recent reporting period, providers prevailed in *84%* of IDR payment determinations. *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, Jan. 1, 2024—June 30, 2024*, CMS, *supra*. During that period, prevailing offers exceeded the QPA *85%* of the time. *See id.* And studies from 2023 show that when providers prevail in IDR, they prevail at a median rate of over three times the QPA. *See* Zachary L. Baron et al., O'Neill Institute, Georgetown Law, *2023 Data from the Independent Dispute Resolution Process: Select Providers Win Big*, available at https://oneill.law.georgetown.edu/ publications/2023-data-from-the-independent-dispute-resolution-process-select-providers-win-big/.

98.    IDREs are compensated on a per-dispute basis. *See* 42 U.S.C. § 300gg-111(c)(5)(F). Disputes are overwhelmingly initiated by providers. Thus, siding with providers incentivizes more providers to file more disputes, which generates greater compensation for the IDREs.

99.    Defendants know that IDREs select the provider's offer in more than 8 out of every 10 payment determinations, so they can frequently prevail with outrageous offers.

100.    On average, Defendants requested an astonishing 900% more than BCBSGA's QPA in IDR. These astronomical amounts far exceed what the Provider Defendants could expect to receive for their services from patients or from health plans in a competitive market. Defendants' systematic requests for these astronomical amounts intentionally exploit the IDR process for undue gains at BCBSGA's expense.

101.    Defendants' payment offers also exploit weaknesses in the IDR process. For example, Defendants know that the IDREs cannot consider the provider's charges when making a payment determination. 42 U.S.C. § 300gg-111(c)(5)(D). Congress prohibited IDREs from considering "inflated," "non-market-based rates such as the providers' billed charges" because merely **considering** the provider's charge "may drive up consumer costs." H.R. Rep. No. 116-615, at 53, 57.

102.    With full knowledge that IDREs cannot consider the Provider Defendants' billed charges, Defendants do not disclose their billed charges to the

IDRE and then submit offers that exceed the Provider Defendants' charges. On average, these billed charges are similarly about nine times the amount of BCBSGA's QPA in IDR.

103.   Defendants' specific scheme of requesting amounts higher than billed charges primarily began in October 2024 and continues through the present time, with IDR demands currently exceeding billed charges by over $400,000 in aggregate.

104.   Prior to the enactment of the NSA, the Provider Defendants rarely, if ever, recovered their full billed charges from patients or health plans. They **never** collected amounts above their charges. But through their scheme to exploit the IDR process, Defendants now often recover amounts that exceed their "inflated, "non-market-based" charges for the services.

## V.    Harm to BCBSGA, BlueCard Plans, Plan Sponsors, and Consumers

105.   As a result of the unlawful conduct by HaloMD and the Provider Defendants, BCBSGA and its employer plan sponsor customers have paid excessive amounts for medical services, incurred unnecessary administrative and arbitration fees, and faced increased costs for healthcare services. The financial harm caused by HaloMD's abusive practices is ongoing and threatens the affordability and sustainability of health benefits for BCBSGA's members.

106.   BCBSGA maintains data on the IDR process dating from January 2024. For a period from January 3, 2024, and April 29, 2025, BCBSGA's data shows that Defendants initiated a whopping 7,268 IDR proceedings against

BCBSGA. However, the earliest publicly available data published by CMS shows that the Provider Defendants began initiating IDR against BCBSGA in January 2023, so the scheme likely began then or before.

107.   BCBSGA determined that 4,966 of the 7,268 disputes from this period—an astounding *70%*—were ineligible for IDR for reasons like failure to initiate mandatory open negotiations, Georgia's specified state law governing the dispute, or that the Provider Defendants had treated a Medicare or Medicaid beneficiary when such plans are exempt from the NSA. For these disputes catalogued in BCBSGA's data, the Provider Defendants were awarded $4,889,185.20 above BCBSGA's original reimbursements.

108.   The ineligible disputes obligated BCBSGA to pay $1,052,611.50 in fees associated with IDR, reflecting $242,973.84 in administrative fees paid to the Departments and $809,637.66 paid to IDREs.

109.   The total financial harm from Defendants' scheme involving ineligible disputes against BCBSGA from this period alone is at least $5,941,796.72.

## THE RICO ENTERPRISE

110.   The enterprise consists of the Provider Defendants and HaloMD (the "Enterprise").

111.   The Enterprise has used the interstate wires to exploit the NSA's IDR process to defraud BCBSGA, its plan sponsors, and BlueCard plans out of millions of dollars. In furtherance of this scheme, the Enterprise (1) uses the

interstate wires to make repeated false representations and attestations of eligibility to the government, the IDREs, and BCBSGA, (2) strategically initiates a massive number of IDRs, most of which are ineligible for the process, and (3) exploits flaws in the IDR process by submitting and often prevailing on knowingly ineligible disputes with outrageous payment offers.

112.    Because of the actions of the Enterprise, approximately 70% of the disputes in which Defendants prevailed against BCBSGA—nearly 5,000 individual disputes—were ineligible for the IDR process. This illegal scheme resulted in damages of more than $5.9 million.

113.    Examples of specific fraudulent disputes are listed below.

**A.    IDR Proceeding DISP-1317978**

114.    The IDR proceeding captioned DISP-1317978 involved an emergency service that SPEMG rendered on November 25, 2023, to a member of a Medicaid managed care plan administered by BCBSGA. SPEMG submitted a claim for reimbursement to BCBSGA using the patient's Medicaid insurance ID number, which means SPEMG reviewed the patient's insurance card and was aware the patient was a Medicaid beneficiary. SPEMG billed $630 in charges for the emergency service. BCBSGA approved the claim to pay $46.97—the Medicaid rate for the services and what Medicaid regulations require providers like SPEMG to accept the approved rate as payment in full. BCBSGA issued an EOP to SPEMG reflecting this payment amount and, like the member's insurance card, evidencing that the patient was a Medicaid beneficiary.

115.    On January 25, 2024, SPEMG sent a notice of open negotiation to BCBSGA. If the services had been qualified for IDR, the deadline to initiate IDR would be four business days after the 30-business-day open negotiation period, or March 14, 2024. Yet IDR was not initiated until May 9, 2024, when HaloMD, on behalf of SPEMG, falsely attested that the services SPEMG rendered to a BCBSGA Medicaid member were qualified for IDR. SPEMG knowingly permitted the services to proceed to IDR despite having full knowledge that they were rendered to a Medicaid member and therefore ineligible for the process. Although BCBSGA timely objected to the dispute's eligibility for IDR, the IDRE notified both BCBSGA and HaloMD on February 3, 2025, that it had deemed the dispute eligible.

116.    BCBSGA submitted its payment offer of $46.97 (the Medicaid rate) and transmitted full payment of fees (the $115 non-refundable administrative fee and the $397 IDRE fee) by the February 18, 2025, deadline. HaloMD, on behalf of SPEMG, submitted an offer of $1,250—approximately *double the amount of SPEMG's billed charges for the service*. Because of Defendants' illegal scheme and false representations of eligibility, the IDRE selected HaloMD's payment offer, and BCBSGA was ordered to, and in fact, adjusted the claim to issue the additional payment to SPEMG.

**B.    IDR Proceeding DISP-1727612**

117.    The IDR proceeding captioned DISP-1727612 involved an emergency service that SPEMG rendered on May 18, 2024, to a member of a

fully insured BCBSGA health plan. As a fully-insured plan, the member's plan is subject to state law, and therefore, Georgia's surprise billing law—rather than the NSA—governed the reimbursement rate for services. SPEMG billed $2,392 for the service, and BCBSGA approved payment of $179.28, which was owed by the member pursuant to their deductible. No QPA applied to this claim because the NSA and IDR were inapplicable.

118.    HaloMD, on behalf of SPEMG, initiated IDR on September 3, 2024, with a false attestation that the emergency service was a qualified IDR item or service. On September 5, 2024, BCBSGA timely responded to the IDR initiation to assert that IDR was not applicable to the dispute, stating: "This claim is subject to GA State Surprise Billing Laws." Nevertheless, the IDRE determined that IDR applied to the dispute and selected HaloMD's payment offer of $3,012. HaloMD's $3,012 offer was *greater than* the $2,392 amount SPEMG had billed for the same service in the original claim. Because of Defendants' illegal scheme and false representations of eligibility, BCBSGA was ordered to, and in fact, adjusted the claim to pay the additional amount on December 27, 2024.

**C.    IDR Proceeding DISP-1317029**

119.    The IDR proceeding captioned DISP-1317029 involved an emergency service that HMP rendered on August 18, 2023, to a member of a fully insured plan administered by BCBSGA. The member's plan is subject to state law and Georgia's surprise billing law, so the services are ineligible for the NSA's IDR process. However, no benefits were available under the member's health

benefit plan, and BCBSGA therefore denied coverage and reimbursement for the service. No QPA applied to this claim because the NSA and IDR were inapplicable for two independent reasons: (1) state law governed reimbursement, and (2) there were no "covered services."

120.    HaloMD, on behalf of HMP, initiated IDR on May 9, 2024, with a false attestation that the emergency service was a qualified IDR item or service. On May 14, 2024, BCBSGA timely responded to the IDR initiation to assert that IDR was not applicable to the dispute. Nevertheless, the IDRE determined that the IDR process applied and selected HaloMD's payment offer of $1,196—equal to HMP's billed charges for the service. Because of Defendants' illegal scheme and false representations of eligibility, BCBSGA was ordered to, and in fact, adjusted the claim to pay the additional amount on October 3, 2024.

### D.    IDR Proceeding DISP-1318943

121.    The IDR proceeding captioned DISP-1318943 involves an emergency service that HMP rendered on December 20, 2023, to a member of a Medicaid managed care plan administered by BCBSGA. HMP submitted a claim for reimbursement to BCBSGA using the patient's Medicaid insurance ID number, which means HMP reviewed the patient's insurance card and was aware the patient was a Medicaid beneficiary. HMP billed $1,196 in charges for the emergency service. BCBSGA approved the claim to pay $71.30—the Medicaid rate for the services and what Medicaid regulations require providers like HMP to accept as payment in full. BCBSGA issued an EOP to HMP reflecting this

payment amount and, like the insurance card, evidencing that the patient was a Medicaid beneficiary.

122.    Neither HMP nor HaloMD initiated open negotiations for this dispute. Nevertheless, HaloMD, on behalf of HMP, initiated IDR on May 9, 2024, with a false attestation that the emergency service was a qualified IDR item or service. On May 14, 2024, BCBSGA timely responded to the IDR initiation to assert that IDR was not applicable to the dispute, noting both that negotiations were not pursued and that the type of plan was not subject to the NSA. Nevertheless, the IDRE determined that the IDR process applied and selected HaloMD's payment offer of $1,196 (equal to HMP's billed charges). Because of Defendants' illegal scheme and false representations of eligibility, BCBSGA was ordered to pay this amount and was responsible for a $115 administrative fee and $620 IDRE fee.

123.    Notably, the IDRE's determination email was addressed to soundnsa@halomd.com, even though the rendering provider was HMP.

**E.    IDR Proceeding DISP-1689761**

124.    The IDR proceeding captioned DISP-1689761 involves an emergency service that HMP rendered on December 26, 2022, to a member of a Medicare Advantage plan administered by BCBSGA. HMP submitted a claim for reimbursement to BCBSGA using the patient's Medicare ID number, which means HMP reviewed the patient's insurance card and were aware they were a Medicare beneficiary. HMP billed $1,761 in charges for the emergency service.

BCBSGA approved the claim to pay $170.86, which was the Medicare rate for the services. BCBSGA issued an EOP to SPEMG reflecting this payment amount and, like the insurance card, evidencing that the patient was a member of a Medicare Advantage plan.

125.    In this dispute, it was SPEMG, rather than HaloMD, who initiated the IDR on behalf of HMP. SPEMG initiated the IDR on March 28, 2025. However, no entity had initiated open negotiations for the service. On the same day IDR was initiated, BCBSGA sent a letter to both HMP (addressed to a national Sound Physicians address in Los Angeles) and the IDRE stating that the services were ineligible for IDR because (1) there had been no open negotiation, and (2) the member's plan type was not subject to the NSA. Nevertheless, the IDRE determined that IDR applied to the dispute and selected SPEMG's payment offer of $1,761—an amount equal to HMP's billed charges and over ten times the appropriate Medicare rate. Because of Defendants' illegal scheme and false representations of eligibility, BCBSGA was ordered to pay this amount and was additionally responsible for a $115 administrative fee and $740 IDRE fee.

**F.    IDR Proceeding DISP-272256**

126.    The IDR proceeding captioned involved emergency services that SPEMG provided to multiple patients during a period from October 21, 2022, to November 7, 2022. Of the ten patients whose services were disputed in this IDR, four were members of fully insured health plans subject to Georgia's surprise billing law, and six were members of various self-funded plans. For each service,

SPEMG billed $1,761 in charges. Its submission of claims to BCBSGA meant SPEMG accessed the patients' insurance information and were aware that the patients were members of different health plans, some subject to state law requirements. BCBSGA approved reimbursement from $88.05 to $283.38, pursuant to the terms of the individual health plans at issue.

127.    SPEMG submitted an open negotiation notice for only one of the ten services disputed in the subsequent IDR. BCBSGA sent correspondence to a national Sound Physicians address in Los Angeles, California acknowledging the open negotiation notice. Otherwise, none of the Defendants pursued open negotiations for this dispute.

128.    On August 20, 2024, SPEMG initiated the IDR on its own behalf (rather than HaloMD) and pursued all ten services as a batched payment dispute. BCBSGA objected to the disputes eligibility, asserting that (1) open negotiations had not been exhausted, (2) certain services were subject to a specified state law, and (3) the NSA's batching rules were not followed because the dispute involved a mixture of insurer and self-funded health plan claims (batching must be according to the same insurer or self-funded health plan).

129.    However, the IDRE incorrect determined that IDR applied to the dispute and selected Sound Physician's payment offer of $1,761 for each service—equivalent to its original billed charges. Because of Defendants' illegal scheme and false representations of eligibility, the IDRE ordered BCBSGA to

pay this amount, and BCBSGA was additionally responsible for an administrative fee of $50 and an IDRE fee of $930.

130. The above examples merely illustrate the rampant conduct implicating thousands of claims submitted to IDR during the period in dispute.

## CLAIMS FOR RELIEF

### COUNT 1 - VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. §§ 1962(c)-(d))

131. BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

132. The Enterprise and the individuals therein conduct their business— legitimate and illegitimate—through corporate entities, each of which is a separate legal entity.

133. At all relevant times, the Enterprise have been "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

134. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

135. Section 1962(d) makes it unlawful for "any person to conspire to violate" Sections 1962(c), among other provisions. 18 U.S.C. § 1962(d).

136.   Since on and before January 3, 2024, the Enterprise has been engaged in a scheme to increase its profits by knowingly submitting claims that were ineligible for the IDR process and knowingly demanding payments far in excess of commercially reasonable amounts.

137.   From the patient's insurance cards, BCBSGA's EOPs, the plain text of federal laws and regulations, CMS publications and resources, their preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that BCBSGA submitted to the Provider Defendants and to HaloMD, among other sources, Defendants knew that the services and disputes that they were initiating were ineligible for the IDR process. Yet Defendants continued to proceed with those services and disputes, and initiate and falsely attest to the eligibility of additional ineligible services and disputes, despite their knowledge of ineligibility.

138.   The Enterprise was associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate wire facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. §§ 1962 (c)-(d).

139.   These predicate acts, committed by interstate wire, include: submitting services and disputes through the online IDR eligibility portal that were ineligible for the IDR process; initiating hundreds of disputes at the same time and in such a way as to make it impossible for BCBSGA to reasonably

identify and object to all ineligible disputes; demanding outrageous payments far in excess of their charges, much less a commercially reasonable amount; engaging in the IDR process in bad faith; and procuring payments from BCBSGA on claims that were ineligible for IDR via interstate wire and through the U.S. mail.

140.    These predicate acts of wire fraud occurred regularly since approximately on and before January 3, 2024, and included electronic communication relating to the IDR process.

141.    The Enterprise profited substantially from the enterprise, ultimately receiving millions in illicitly obtained credits from BCBSGA and further damaging BCBSGA by more than $1 million in additional fees. These IDR initiations were submitted via interstate wire facilities.

142.    At all relevant times, the Enterprise and the individuals therein were associated-in-fact for the common purpose of engaging in the profit-making scheme alleged herein.

143.    The members of the RICO enterprise all shared a common purpose to enrich themselves at the expense of BCBSGA by fraudulently inducing and compelling BCBSGA to pay exorbitant amounts for services that were not eligible for the IDR process.

144.    The participants in the RICO enterprise had systematic linkage to each other through contractual relationships, financial ties, shared correspondence, common addresses for correspondence and receipt of payment,

and continuing coordination of activities. The Enterprise functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purpose of increasing their revenues and profits. The Enterprise participated in the operation and management of the RICO enterprise by directing its affairs as described herein.

145. The Enterprise conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal wire fraud statute, which prohibits the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

146. The Enterprise received payment for the fraudulent claims from BCBSGA through the interstate wire facilities in violation of 18 U.S.C. §§ 1341 and 1343. Each such payment constituted a separate wire fraud violation. Each of these violations was related because they shared the common purpose of defrauding BCBSGA.

147. These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

148. The Enterprise had the specific intent to participate in the overall RICO enterprise, which is evidenced by its scheme to defraud BCBSGA.

149. The Enterprise conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through

a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, the claims submitted to the IDR process contained uniform misrepresentations that the claims were eligible for that process, and contained inflated amounts.

150.    The Enterprise and the individuals therein conspired to violate Sections 1962(c), in violation of 18 U.S.C. § 1962(d).

151.    BCBSGA is entitled to treble damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT 2 – VIOLATION OF THE GEORGIA RICO STATUTE, O.C.G.A. § 16-14-4

152.    BCBSGA incorporates by reference the allegations in Paragraphs 1 to 151.

153.    The Georgia RICO statute, O.C.G.A. § 16-14-4, subsection (b), prohibits "any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

154.    The Enterprise engaged in a pattern of racketeering activity in violation of the Georgia RICO statute by knowingly submitting claims that were ineligible for the IDR process and knowingly demanding payments in excess of commercially reasonable amounts. These claims were submitted, and these payments were received, through the use of interstate wire communications.

155.    The Enterprise further conspired and/or endeavored to violate the Georgia RICO statute in violation of O.C.G.A. § 15-14-4, subsection (c).

Defendants formed an "enterprise" under the Georgia RICO statute. Defendants had a common purpose to submit ineligible claims and obtain improper payments. Defendants worked together to do so, forming relationships among them of sufficient longevity to permit their coconspirators to pursue the enterprise's purpose.

156.    BCBSGA suffered economic injury that flowed directly from the Enterprise's violations of the Georgia RICO statute and was proximately caused thereby.

157.    As a result thereof, the Enterprise's conduct and participation in the racketeering activity described herein has caused millions of dollars in damages.

158.    BCBSGA is also entitled to treble damages pursuant to O.C.G.A. § 16- 14-6, subsection (c).

### COUNT 3 – COMMON LAW FRAUD/FRAUDULENT MISREPRESENTATION

159.    BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

160.    For each of the IDRs initiated, Defendants submitted a completed version of the mandatory IDR notice of initiation to the Departments, to the IDREs, and to BCBSGA, which, in part, contained the following attestation:

> I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge…the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

161.   The Provider Defendants, or HaloMD on behalf of the Provider Defendants, submitted the IDR notice of initiation in each dispute with full knowledge of, or at the very least with reckless disregard to, the falsity of this attestation. From the patient's insurance cards, BCBSGA's EOPs, the plain text of federal laws and regulations, CMS publications and resources, the Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that BCBSGA submitted to the Provider Defendants and to HaloMD, among other sources, Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

162.   The Provider Defendants, and HaloMD on behalf of the Provider Defendants, nevertheless submitted these false attestations and did so with the intent that the IDRE and BCBSGA rely on them. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"— including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Even if BCBSGA contested eligibility, Defendants' deliberate misrepresentation to the IDRE, on which the IDRE relied, forced BCBSGA to rely on the misrepresentation because once the IDRE determines the dispute is eligible, BCBSGA has no choice but to proceed with the process, submit a final offer, and allow the dispute the continue to a payment determination; any other approach would result in a default award against BCBSGA in favor of HaloMD

and the Provider Defendant it represented for whatever outrageous amount HaloMD included in its final offer.

163.    These false attestations of eligibility pertain to material facts in the IDR process because they go to the heart of the IDRE's jurisdiction to even hear the dispute.

164.    The Provider Defendants, and HaloMD on behalf of the Provider Defendants, submitted the false attestations to receive a windfall for themselves, namely, IDR payment determinations in favor of Defendants and against BCBSGA regarding items or services that were ineligible for resolution through the IDR process.

165.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, HaloMD was acting within the scope of its agreements with the Provider Defendants to handle the IDR process for the Provider Defendants in connection with the identified disputes.

166.    The Provider Defendants, and HaloMD on behalf of the Provider Defendants, also fraudulently misrepresented to BCBSGA during the statutorily required open negotiations process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term.

167.    BCBSGA reasonably and justifiably relied on Defendants' misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic to strategically

flood the IDR process and overwhelm the system precluded BCBSGA from investigating each and every aspect of the tens of thousands of disputes they submitted, within the 30-day open negotiations window or within days after IDR initiation. Additionally, in some cases (such as when the patient waived balance billing protections), HaloMD and the Provider Defendants are the only entities in possession of information critical to BCBSGA's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. As a result, BCBSGA justifiably relied on HaloMD's misrepresentation that the disputes were eligible for IDR and incurred significant monetary losses through incurring fees required by the NSA and in the form of IDR payment determinations finding against BCBSGA.

168.    As a direct result of these misrepresentations by Defendants, BCBSGA has suffered substantial damages in the form of payment on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

## COUNT 4 – NEGLIGENT MISREPRESENTATION

169.    BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

170.    In submitting the false attestations of eligibility, the Provider Defendants, and HaloMD on behalf of the Provider Defendants, misrepresented material facts to the IDRE and BCBSGA regarding eligibility of the disputes to proceed to the IDR payment determination stage. From the patient's insurance

cards, BCBSGA's EOPs, the plain text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that BCBSGA submitted to the Provider Defendants and to HaloMD, among other sources, Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

171.    Defendants owed a duty of reasonable care to BCBSGA, under which they were required to conduct reasonable investigation, ensure the eligibility of the services for which they were initiating the IDR process, and guard against the submission of false attestations of eligibility leading IDREs to erroneously issue payment determinations in favor of Defendants for items or services that were not eligible for the IDR process.

172.    The Provider Defendants, and HaloMD on behalf of the Provider Defendants, submitted these false attestations with the intent that the IDRE and BCBSGA rely on them. Even if BCBSGA contested eligibility, Defendants' deliberate misrepresentation to the IDRE, on which the IDRE relied, forced BCBSGA to rely on the misrepresentation because, once the IDRE determines the dispute is eligible, BCBSGA has no choice but to proceed with the process, submit a final offer, and allow the dispute the continue to a payment determination; any other approach would result in a default award against BCBSGA in favor of HaloMD and the Provider Defendant it represented for

whatever outrageous amount HaloMD included as the Provider Defendant's final offer.

173. The Provider Defendants and/or HaloMD on behalf of the Provider Defendants falsely represented during the statutorily required open negotiations process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term.

174. BCBSGA reasonably, foreseeably, and justifiably relied on Defendants' misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic was to flood the IDR process and overwhelm the system such that BCBSGA would be unable to investigate each and every aspect of the tens of thousands of disputes often submitted on the same day within the 30-day open negotiations window or within days after IDR initiation. Additionally, HaloMD and the Provider Defendants are in some circumstances the only entities in possession of information critical to BCBSGA's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. As a result, BCBSGA justifiably relied on HaloMD's misrepresentation that the disputes were eligible for IDR and incurred significant monetary losses through incurring fees required by the NSA and in the form of IDR payment determinations finding against BCBSGA.

175. As a result of Defendants' misrepresentations, and BCBSGA's reasonable reliance on the same, BCBSGA, its plan sponsors, and BlueCard plans

have suffered substantial damages in the form of payment on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

### COUNT 5 – STATUTORY FRAUD

176.   BCBSGA incorporated by reference the allegations in Paragraphs 1 to 130.

177.   Fraud, accompanied by damage to the party defrauded, always gives a right of action to the injured party. O.C.G.A. § 51-6-1.

178.   Georgia law provides such a right of action where there is a willful misrepresentation of material fact, made to induce another to act, upon which such person acts to his injury. O.C.G.A. § 51-6-2(a).

179.   As detailed above, the Provider Defendants, and HaloMD on behalf of the Provider Defendants, willfully misrepresented to the Departments, the IDREs, and BCBSGA that the ineligible disputes were eligible for IDR resolution in the form of the false attestations of eligibility in the IDR initiation notices. These facts were material because they go to the critical issue of eligibility for the IDR process and the jurisdiction of the IDREs.

180.   From the patient's insurance cards, BCBSGA's EOPs, the plain text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that BCBSGA submitted to the Provider Defendants and to HaloMD, among other sources, Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

181.   As a result, BCBSGA was induced to act, and in fact did act, to its detriment and incurred injury as a result. Specifically, BCBSGA relied on Defendants' misrepresentations, and it was statutorily compelled to participate in IDR proceedings for ineligible services and disputes because the false attestations induced the IDREs to find that the IDR process applied and erroneously issue payment determinations in favor of HaloMD and the Provider Defendants.

182.   BCBSGA, its plan sponsors, and BlueCard plans suffered significant monetary harm in the form of paying statutory fees associated with the ineligible IDR disputes, in addition to its payments to Defendants relating to IDRE payment determinations on the ineligible disputes.

### COUNT 6 – THEFT BY DECEPTION

183.   BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

184.   The Provider Defendants, and HaloMD on behalf of the Provider Defendants, submitted false attestations to the Departments, the IDREs, and BCBSGA that constitute theft by deception. Under Georgia law, a party commits the crime of theft by deception when it "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a).

185.   A party's conduct is deceitful for purposes of Section 16-8-3(a) when the party "[c]reates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false" or

"[f]ails to correct a false impression of an existing fact or past event which he previously created or confirmed." O.C.G.A. § 16-8-3(b).

186.   While Section 16-8-3(a) is a criminal statute, "[a]ny owner of personal property shall be authorized to bring a civil action to recover damages from any person who … commits a theft as defined in Article 1 of Chapter 8 of Title 16 involving the owner's personal property." O.C.G.A. § 51-10-6(a).

187.   Specific amounts of money paid to a party by wire or other means are specific and identifiable funds and so constitute personal property for purposes of Section 16-8-3(a).

188.   As set forth in more detail above, HaloMD and the Provider Defendants acquired specific and identifiable funds from BCBSGA in the form of payment of IDR payment determinations by means of false attestations submitted to the Departments, IDREs, and BCBSGA.

189.   HaloMD and the Provider Defendants obtained these funds from BCBSGA by creating the impression through its false attestations submitted to the Departments, IDREs, and BCBSGA that the services and disputes at issue were eligible for IDR when Defendants knew that these impressions were false.

190.   Defendants failed to correct these false impressions at any time after initiating the IDR process or after obtaining IDR payment determinations in favor of the Provider Defendants relating to claims that they knew were not eligible for the IDR process.

191.    As a result of Defendants' deceit, BCBSGA was ordered to pay at least $4,889,185.20 in ineligible IDR payment determinations.

192.    BCBSGA is entitled to recover the funds that it paid to Defendants on ineligible IDR payment determinations, including any portion thereof retained by HaloMD as compensation under its arrangements with the Provider Defendants, for such awards pursuant to O.C.G.A. § 51-10-6(b)(1), as well as IDR fees that it paid in relation to such determinations.

### COUNT 7 – CIVIL CONSPIRACY

193.    BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

194.    HaloMD and the Provider Defendants conspired to implement the scheme described herein, resulting in harm to BCBSGA.

195.    Specifically, each of the Provider Defendants retained HaloMD to represent them in the ineligible IDR disputes.

196.    As detailed above, the Provider Defendants share the same address (including suite number), employ the same individual as their CEO, CFO, and Secretary. Defendants also have access to each other's email domain addresses and relevant claims, services, and documentation.

197.    Each co-conspirator played an integral role in carrying out the scheme, including providing funding, directing billing practices, and facilitating the submission of improper claims and IDR proceedings.

198.   As a result of the orchestrated scheme between HaloMD and the Provider Defendants to submit material misrepresentations to the IDREs and BCBSGA regarding eligibility of the IDR disputes, BCBSGA, its plan sponsors, and BlueCard plans have suffered substantial damages in the form of payment on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

### COUNT 8 – VIOLATION OF GEORGIA DECEPTIVE TRADE PRACTICES ACT (O.C.G.A. 10-1-372)

199.   BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

200.   Defendants' conduct constitutes deceptive acts in violation of the Georgia Deceptive Trade Practices Act, O.C.G.A. 10-1-372.

201.   BCBSGA and Defendants fit within the definition of "person" under O.C.G.A. 10-1-371(5), meaning Defendants are subject to the statute's prohibitions on certain deceptive practices, and BCBSGA is empowered to bring a claim relating to a violation of the Georgia Deceptive Trade Practices Act.

202.   By falsely representing to the Departments, the IDREs, and BCBSGA that items or services were eligible for IDR resolution, the Provider Defendants, and HaloMD on behalf of the Provider Defendants, represented that the services in dispute were of a particular standard, quality, or grade (*i.e.*, that they were within the scope of the NSA and amendable to IDR) when, in fact, the services were not (*i.e.*, they were ineligible for IDR, despite Defendants' false

attestations to the contrary in its IDR initiation notices), in violation of O.C.G.A. 10-1-372(a)(7).

203.   By falsely representing to the IDREs and BCBSGA that items or services were eligible for IDR resolution, Defendants also represented that the services in dispute had sponsorship, approval, or characteristics (*i.e.*, that they were within the scope of the NSA and amendable to IDR) when, in fact, the services did not (*i.e.*, they were ineligible for IDR, despite Defendants' false attestation to the contrary in its IDR initiation notices), in violation of O.C.G.A. 10-1-372(a)(5).

204.   When Defendants falsely represent to the Departments, the IDREs, and BCBSGA that items or services are eligible for IDR resolution when they are in fact ineligible, Defendants also engage in conduct that creates a likelihood of confusion or misunderstanding, on the part of the Departments, the IDRE, and BCBSGA, in violation of O.C.G.A. 10-1-372(a)(12).

205.   Defendants' acts have caused substantial economic harm to BCBSGA, its employer plan sponsor customers, and other BlueCard plans.

206.   BCBSGA is entitled to an order enjoining these practices in violation of the statute, in addition to its costs and attorneys' fees in connection with bringing this action.

### COUNT 9 – VACATUR OF NSA ARBITRATION AWARDS

207.   BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

208.   HaloMD improperly obtained arbitration awards under the NSA by misrepresenting the services were qualified IDR items or services, warranting vacatur of such awards under 9 U.S.C. § 10(a) and 42 U.S.C. § 300gg-111(c)(5)(E).

209.   The IDR payment determinations at issue were procured by undue means and misrepresentation.

210.   For the IDR payment determinations at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process.

211.   HaloMD and the Provider Defendants continue to obtain awards by undue means and misrepresentation. Thus, the list of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case.

### COUNT 10 – ERISA CLAIM FOR EQUITABLE RELIEF

212.   BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

213.   BCBSGA provides claims administration services for certain health benefit plans governed by ERISA. Those health benefit plans and their employer sponsors delegate to BCBSGA discretionary authority to recover overpayments, including those resulting from fraud, waste, or abuse.

214.   ERISA authorizes a fiduciary of a health plan to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or

the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

215.   Section 1185e of ERISA sets out the rights and obligations of plans and medical providers with respect to the IDR process, including that the IDR process does not apply in situations where there is a specified state law, where the provider is a participating provider, and where the provider has not initiated or engaged in open negotiations. 29 U.S.C. § 1185e.

216.   Through the acts described herein, Defendants have caused and continue to cause the overpayment of funds on behalf of ERISA-governed benefit plans through conduct that violates Section 1185e of ERISA.

217.   Defendants are continuing to engage in such improper conduct, including but not limited to failing to properly initiate or engage in open negotiations prior to initiating the IDR process, initiating IDR for beneficiaries of government program exempt from NSA requirements, initiating IDR for services subject to Georgia's specified state law, initiating IDR with respect to claims that BCBSGA denied and thus are exempt from the IDR process, and failure to comply with other NSA requirements such as the IDR batching rules or the cooling off period. This conduct causes ongoing harm to BCBSGA and the ERISA-governed benefit plans.

218.   There is an actual case and controversy between BCBSGA and Defendants relating to the claims fraudulently submitted and arbitrated as part of the NSA IDR process.

219.   BCBSGA seeks an order enjoining Defendants from:

   a.   Initiating IDR without first properly initiating and engaging in open negotiations;

   b.   Initiating IDR for beneficiaries of government program exempt from NSA requirements;

   c.   Initiating IDR for services subject to Georgia's specified state law;

   d.   Initiating IDR for services that BCBSGA denied and thus are not eligible for IDR; and

   e.   Initiating IDR for services when Defendants failed to comply with other NSA requirements such as the IDR batching rules and the cooling off period.

### COUNT 11 – DECLARATORY AND INJUNCTIVE RELIEF

220.   BCBSGA incorporates by reference the allegations in Paragraphs 1 to 130.

221.   BCBSGA seeks a declaration that Defendants' conduct in submitting false attestations and initiating IDR for unqualified IDR items or services is unlawful. BCBSGA additionally seeks a declaration that IDR awards for such unqualified IDR items or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate IDR for items or services that are not qualified for IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for IDR.

222. With respect to health plans and claims governed by ERISA, this cause of action is alleged in the alternative to the previous cause of action, in the event that the Court determines that relief under Section 1132(a)(3) of ERISA is not available.

223. There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, BCBSGA respectfully requests that the Court:

a. Vacate all improperly obtained NSA arbitration awards;

b. Enter an injunction prohibiting Defendants from submitting unqualified IDR items and services to IDR and otherwise initiating improper arbitrations;

c. Award compensatory, punitive, and exemplary damages;

d. Order the return of funds wrongfully obtained by Defendants;

e. Award costs, attorney's fees, and interest;

f. Declare that IDR awards issued on unqualified IDR items or services are non-binding and are not payable on a go-forward basis;

g. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

BCBSGA demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: May 27, 2025

  /s/ *David W. Long Daniels*     
David W. Long-Daniels
Georgia Bar No. 141916
**Reed Smith LLP**
999 Peachtree Street, NE
Suite 2500
Atlanta, GA 30309
Tel: 470.947.5800
dlong-daniels@reedsmith.com

Martin J. Bishop (*pro hac vice* forthcoming)
Illinois Bar No. 6269425
Alexandra M. Lucas (*pro hac vice* forthcoming)
Illinois Bar No. 6313385
Jason T. Mayer (*pro hac vice* forthcoming)
Illinois Bar No. 6309633
**Reed Smith LLP**
10 S. Wacker Dr. Suite 4000
Chicago, IL 60606
Tel: 312.207.1000
mbishop@reedsmith.com
alucas@reedsmith.com
jmayer@reedsmith.com

Zachary B. Kizitaff (*pro hac vice* forthcoming)
Pennsylvania Bar No. 327568
**Reed Smith LLP**
Three Logan Square
1717 Arch St. Suite 3100
Philadelphia, PA 19103
Tel: 215.851.8100
zkizitaff@reedsmith.com

*Attorneys for Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.*