# Exhibit A

Case 1:25-cv-02919-TWT    Document 71-1    Filed 11/21/25    Page 2 of 10

2025 WL 3222820
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

REACH AIR MEDICAL SERVICES
LLC, Plaintiff-Appellant,
v.
KAISER FOUNDATION HEALTH PLAN INC.,
C2C Innovative Solutions, Inc., Defendants-Appellees.

No. 24-10135
|
Filed: 11/19/2025

Appeal from the United States District Court for the Middle
District of Florida, D.C. Docket No. 3:22-cv-01153-TJC-JBT

**Attorneys and Law Firms**

Charlotte Taylor, Amelia A. DeGory, Jones Day, Washington,
DC, Abraham Chang, Norton Rose Fulbright US LLP,
Houston, TX, Lanny Russell, Smith Hulsey & Busey,
Jacksonville, FL, Adam T. Schramek, Norton Rose Fulbright
US LLP, Austin, TX, for Plaintiff-Appellant.

Mohammad Keshavarzi, Sheppard Mullin Richter &
Hampton, LLP, Los Angeles, CA, Megan Kathleen
McKisson, John Burns, Matthew G. Halgren, Sheppard
Mullin Richter & Hampton, LLP, San Diego, CA, Christian
Edward Dodd, Hickey Smith LLP, Jacksonville, FL, for
Defendant-Appellee Kaiser Foundation Health Plan Inc.

Jeffrey A. Cohen, Samuel Blake Spinner, Carlton Fields,
PA, Miami, FL, Peter E. Nicandri, Michael T. Fackler,
Pierce N. Giboney, Milam Howard Nicandri & Gillam,
PA, Jacksonville, FL, Joseph H. Lang, Jr., Carlton Fields,
PA, Tampa, FL, for Defendant-Appellee C2C Innovative
Solutions, Inc.

Hyland Hunt, Deutsch Hunt PLLC, Washington, DC, for
Amicus Curiae America's Health Insurance Plans, Inc.

Sarah Clark Griffin, DOJ-CIV, Civil Division, Appellate
Staff, Washington, DC, for Amicus Curiae United States of
America.

Before Jill Pryor, Grant, and Marcus, Circuit Judges.

**Opinion**

Marcus, Circuit Judge:

**\*1** This case arises out of an insurance dispute and
subsequent arbitration proceedings between REACH Air
Medical Services LLC ("Reach"), a provider of air ambulance
services, and Kaiser Foundation Health Plan Inc. ("Kaiser"),
a health maintenance organization. In February 2022, Reach
provided emergency air ambulance services to a patient
insured by Kaiser, but Reach was not in-network with
Kaiser. After failing to agree about how much Reach
should be paid for the transport, Kaiser and Reach
commenced the Independent Dispute Resolution ("IDR")
process outlined in the federal No Surprises Act, ⚑42 U.S.C.
§§ 300gg-111–139. Each submitted its offer and rationale
to the assigned arbitrator, C2C Innovative Solutions, Inc.
("C2C") pursuant to the rules and procedures governing the
NSA. When C2C chose Kaiser's offer of $24,813.48, Reach
accused Kaiser of fraud, since Kaiser had submitted a lower
figure for its Qualifying Payment Amount ("QPA") to C2C
during the IDR process than it did to Reach before IDR
had commenced. Reach sued Kaiser and C2C in the Middle
District of Florida to vacate C2C's IDR determination. The
district court dismissed Reach's Complaint without prejudice
and also dismissed C2C from the case with prejudice.

The district court got it right. We review arbitration decisions
very narrowly, and there is a strong legal presumption
that arbitration awards will be confirmed. Nothing in the
newly codified NSA, which has expressly incorporated some
sections of the Federal Arbitration Act ("FAA"), has altered
that limited scope of judicial review. The Complaint does not
come close to alleging what is required to vacate an arbitration
award under the FAA for fraud or undue means or because
the arbitrator exceeded its authority. Accordingly, we affirm
the district court's dismissal in full.

I.

The following salient factual allegations are drawn from the
Complaint. When reviewing a motion to dismiss, we are
required to accept the complaint's well-pleaded allegations as
true. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir.
2017) (citing ⚑*Montgomery Cnty. Comm'n v. Fed. Hous.
Fin. Agency*, 776 F.3d 1247, 1254 (11th Cir. 2015)).

Most healthcare plans include a "network of providers and health care facilities ... [that] agree by contract to accept a specific amount for their services." Requirements Related to Surprise Billing, 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). Providers and facilities outside of a patient's plan or network usually charge higher amounts than these contracted rates. *Id.* When a patient goes to an out-of-network provider or facility, a health insurance issuer "may decline to pay for the service" or may pay for less than the amount the patient is charged. *Id.* Under this system, the healthcare provider can generally bill the patient for the remainder of the balance. *Id.* This practice is known as "balance billing," or, when it involves medical services from providers or facilities that the patient believed were in-network but were actually out-of-network, "surprise billing." *Id.*

**\*2** Congress passed the No Surprises Act ("NSA") in no small measure to address the issue of "surprise billing." Among other provisions, the NSA generally limits the amount an insured patient will pay for emergency services furnished by an out-of-network provider and for certain non-emergency services rendered by an out-of-network provider at an in-network healthcare facility. ⚑42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132. Under the NSA, healthcare providers must instead seek payment from health plans or health insurance issuers to pay for these services. ⚑*Id.* § 300gg-111(c)(1)(A).

These provisions of the NSA also apply to air ambulance services. *Id.* § 300gg-112. After an insured patient receives air ambulance services, the NSA requires group health plans or health insurance issuers to send an initial payment or notice of denial of payment to the air ambulance service provider within 30 days. *Id.* § 300gg-112(a)(3)(A). The provider then has 30 days from the date of payment or notice of denial of payment to initiate negotiations to determine an agreed-upon amount for air ambulance services. *Id.* § 300gg-112(b)(1)(A). However, if negotiations fail, then either side may initiate arbitration through the "independent dispute resolution process." *Id.* § 300gg-112(b)(1)(B). A "certified IDR entity" oversees the IDR process, during which each side submits an offer for a payment amount, as well as any other information requested by the certified IDR entity relating to the offer. *Id.* § 300gg-112(b)(4), (5)(B). Then, in "baseball-style arbitration" -- in which an arbitrator must choose one of the offers submitted by the parties and cannot select any other figure -- the certified IDR entity selects one of the offers submitted to be the amount of payment for air ambulance

services rendered. *Id.* § 300gg-112(b)(5)(A)(i). Neither party can respond to the other party's submission.

On February 7, 2022, a patient insured through Kaiser Foundation Health Plan Inc. required emergency air transport from Santa Rosa, California to Redwood City, California. REACH Air Medical Services LLC answered the call, flying the patient 80 miles on a helicopter specially configured for medical transport and providing continuous medical care during the trip. Reach, however, was out-of-network with Kaiser, meaning that the two did not have a pre-negotiated reimbursement amount for the trip. Kaiser paid Reach $24,813.48 for the transport. In its Explanation of Benefits statement, Kaiser represented to Reach that this amount was the "Qualifying Payment Amount" -- essentially the median rate a health plan pays in-network providers. ⚑42 U.S.C. § 300gg-111 (a)(3)(E)(i). Reach and Kaiser could not agree on how much Reach should have been paid for the air transport, so the dispute proceeded to the IDR process under the NSA. Reach and Kaiser also could not agree on an arbitrator to adjudicate their dispute, so they were assigned to arbitrate before an arbitrator from C2C Innovative Solutions, Inc., a medical appeals company that began accepting IDR disputes between payors and providers under the NSA in 2022.

During the IDR, Kaiser submitted an offer for $24,813.48. Kaiser also told C2C that the QPA was $17,304.29 -- a lower QPA than what Kaiser originally told Reach. According to Reach, this lower figure indicated to C2C that Kaiser's offer was higher than the QPA. Meanwhile, Reach submitted an offer of $52,474.60 to C2C. After baseball-style arbitration, and after reviewing all of the evidence, C2C chose Kaiser's offer. The arbitrator determined that Kaiser's "offer best represents the value of the services at issue."

**\*3** Unhappy with the results before the IDR arbitration, on October 26, 2022, Reach sued Kaiser and C2C in the United States District Court for the Middle District of Florida.[1] In its Complaint, Reach asked the district court to vacate the arbitration award rendered and to direct that C2C rehear the claim. Reach asserted, among other things, that the health plan secured the arbitrator's decision through "undue means and misrepresentations" and "in bad faith." Kaiser and C2C moved to dismiss the Complaint.

On November 1, 2023, the district court granted both motions, dismissing the Complaint without prejudice as to Kaiser and with prejudice as to C2C. The trial court explained that

judicial review of IDR awards is limited to the grounds available under the FAA, 9 U.S.C. § 10(a)(1)–(4), and cannot be expanded to include circumstances where facts may be misrepresented to the IDR arbitrator. Under that framework, the court ruled that Reach failed to meet the heightened pleading requirements of ⚑ Federal Rule of Civil Procedure 9(b). The district court afforded Reach the opportunity to amend its Complaint. Finally, it determined that Congress did not create a cause of action in the NSA allowing a party to sue the IDR entities themselves and therefore granted C2C's motion to dismiss with prejudice. On November 3, 2023, Reach filed a Notice of Intent to Stand on Existing Complaints, disclaiming its leave to amend. The court entered final judgment on December 22, 2023.

This timely appeal followed.

## II.

We review the district court's dismissal of Reach's claims for failure to state a claim *de novo*. *Smith*, 873 F.3d at 1351 (citing ⚑ *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017)). "In assessing the sufficiency of a claim, we accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor." *Id.* (citing ⚑ *Montgomery Cnty. Comm'n*, 776 F.3d at 1254). However, "[a] plaintiff must plausibly allege all the elements of the claim for relief. Conclusory allegations and legal conclusions are not sufficient; the plaintiff[ ] must 'state a claim to relief that is plausible on its face.' " *Id.* (alterations in original) (quoting ⚑ *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339–40 (11th Cir. 2017)).

In addition, "claims of fraud must satisfy the requirements of ⚑ Rule 9(b)." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022). "Under ⚑ Rule 9(b), claims of fraud must be [pled] with particularity, which means identifying the who, what, when, where, and how of the fraud alleged." *Id.* (citing ⚑ *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). This rule "alert[s] defendants to the 'precise misconduct with which they are charged' and protect[s] defendants 'against spurious charges of immoral and fraudulent behavior.' " *Id.* (quoting ⚑⚠ *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

On appeal, Reach asserts that (1) C2C exceeded its authority because it applied an illegal presumption for Kaiser's QPA; (2) Kaiser's misrepresentation of its QPA warranted vacatur of the arbitration award because it constituted either fraud or undue means; and (3) IDR entities like C2C may be sued under the NSA.

**\*4** The district court correctly dismissed the Complaint because the arbitrator did not act in excess of its authority, and Reach did not adequately plead fraud or undue means. Under the No Surprises Act:

> A determination of a certified IDR entity under subparagraph (A)--
>
> (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
>
> (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

⚑ 42 U.S.C. § 300gg-111(c)(5)(E)(i). Section 10(a) of Title 9 of the FAA, in turn, reads this way:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

As a preliminary matter, the district court correctly determined that the NSA incorporates the meaning of the terms used in the FAA, 9 U.S.C. § 10(a)(1)–(4), as interpreted by courts. "When Congress adopts a new law that incorporates sections of a prior law, 'Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.' " *United States v. Florida*, 938 F.3d 1221, 1228 (11th Cir. 2019) (quoting *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). Moreover, "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (citing *Lorillard*, 434 U.S. at 580–81, 98 S.Ct. 866); *see also Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1329 (11th Cir. 2003) (same); *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270, 140 S.Ct. 1498, 206 L.Ed.2d 732 (2020) (explaining that "when Congress 'adopt[s] the language used in [an] earlier act,' we presume that Congress 'adopted also the construction given by this Court to such language, and made it a part of the enactment.' " (alterations in original) (quoting *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 139 S. Ct. 628, 634, 202 L.Ed.2d 551 (2019))).

The NSA explicitly incorporates the FAA's provisions allowing for the vacatur of arbitration awards: "A determination of a certified IDR entity ... shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9." [2] 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Because the NSA is "a new law that incorporates sections of a prior law," we presume that Congress "had knowledge of the interpretation given to the incorporated law" -- in this case, the FAA. *Florida*, 938 F.3d at 1228 (quoting *Lorillard*, 434 U.S. at 581, 98 S.Ct. 866). Thus, we need not reinterpret the provisions of the FAA as Reach suggests -- we may rely instead on our case law interpreting the FAA. After all, Congress designed the IDR process to create an "efficient" and streamlined vehicle for a certain category of disputes, all designed to "minimiz[e] costs" -- similar purposes to those animating the passage of the FAA. 42 U.S.C. § 300gg-111(c)(3)(A);

*id.* § 300gg-111(c)(4)(E); *see O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988) ("It is well-established that '[t]he purpose of the Federal Arbitration Act was to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation.' " (alteration in original) (quoting *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176, 1179 (11th Cir. 1981))).

**\*5** "Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.' " *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). "There is a presumption under the FAA that arbitration awards will be confirmed, and 'federal courts should defer to an arbitrator's decision whenever possible.' " *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010) (quoting *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 909 (11th Cir. 2006)). A party seeking to vacate an arbitrator's award "bears the heavy burden of demonstrating that vacatur is appropriate" and must prove "the existence of one or more of four statutorily enumerated causes for reversal." *Wiand v. Schneiderman*, 778 F.3d 917, 925 (11th Cir. 2015) (citing *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1223 (11th Cir. 2000)).

We begin with Reach's claim that C2C exceeded its authority under Section 10(a)(4) of the FAA by applying an illegal presumption in favor of Kaiser. Under Section 10(a)(4), an arbitration award "may be unenforceable," but "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.' " *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) (alterations in original) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam)). Indeed, "[w]hile a federal court may vacate an arbitration award when it 'exceeds the scope of the arbitrator's authority,' few awards are vacated because the scope of the arbitrator's authority is so broad." *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083, 1087 (11th Cir. 2016) (quoting *IMC-Agrico Co. v. Int'l Chem.*

*Workers Council of the United Food & Com. Workers Union*, 171 F.3d 1322, 1325 (11th Cir. 1999)) (internal citation omitted). "It is not enough ... to show that the [arbitrator] committed an error -- or even a serious error." *Sutter*, 569 U.S. at 569, 133 S.Ct. 2064 (alterations in original) (quoting *Stolt-Nielsen*, 559 U.S. at 671, 130 S.Ct. 1758). Rather, "[o]nly if 'the arbitrator act[s] outside the scope of his ... authority' -- issuing an award that 'simply reflect[s] [his] own notions of [economic] justice' ... -- may a court overturn his determination." *Id.* (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000)).

"[U]nder our current scheme, an arbitrator's actual reasoning is of such little importance to our review that it need not be explained -- the decision itself is enough." *Gherardi v. Citigroup Glob. Mkts. Inc.*, 975 F.3d 1232, 1237 (11th Cir. 2020) (citing *O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988)). "Our 'sole question' under § 10(a)(4) ... is 'whether the arbitrator (even arguably) [performed the assigned task], not whether she got [the outcome] right or wrong.' " *Id.* at 1238 (quoting *Wiregrass*, 837 F.3d at 1088).

We have recognized only a few examples of instances in which an arbitrator exceeds his authority under Section 10(a)(4):

> awarding relief on a statutory claim when the arbitration agreement allows only for arbitration of contractual claims, *see Paladino v. Avnet Comput. Techs., Inc.*, 134 F.3d 1054, 1061 (11th Cir. 1998); failing to give preclusive effect to an issue already (and properly) decided by a court, *see Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997); and forcing a party to submit to class arbitration without a contractual basis for concluding that the party agreed to it, *see Stolt-Nielsen*, 559 U.S. at 684, 130 S.Ct. 1758.

**\*6** *Id.* at 1237. None of these circumstances, or anything even remotely resembling them, is present here.

What's more, even if we were to more closely scrutinize C2C's arbitral determination, Reach fails to plausibly allege that C2C failed to interpret the NSA and related regulations or that it applied an illegal presumption in favor of Kaiser's submitted QPA. The IDR determination reads this way:

> As noted above, the IDRE must consider related and credible information submitted by the parties to determine the appropriate [out of network] rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. However, the information submitted did not support the allowance of payment at a higher OON rate.
>
> Based upon review of the submitted information, the IDRE has selected the non-initiating party's offer of $16,781.48 for code A4031 and $8,032.00 for code A0436. The IDRE finds that this offer best represents the value of the services at issue. Therefore, the IDRE has determined the non-initiating party prevailed.

C2C explained why it chose the higher OON rate between the offers that Kaiser and Reach submitted (both of which exceeded the QPA that Kaiser submitted to C2C). In other words, C2C explained that after reviewing all of the evidence submitted in the IDR process, and after being required by statute to choose between the two offers submitted by Reach and Kaiser, the better payment option was the lower offer. The language that Reach identifies in C2C's IDR determination -- that the "information submitted did not support the allowance of payment at a higher OON rate" -- indicates only that Kaiser's offer was better than Reach's offer. The language of C2C's IDR determination does not support Reach's conclusory argument that C2C applied an illegal presumption in favor of Kaiser and thereby exceeded its authority as an arbitrator. C2C never said in the award that Reach was required to "prove that 'a higher OON rate' than the QPA was warranted." It also never said that the QPA was the baseline. Accordingly, the district court correctly dismissed Reach's claim that the arbitrator exceeded its authority.

Moreover, the district court correctly determined that Reach failed to plead that the IDR determination was obtained through "fraud" or "undue means" because Reach failed to meet its burden under FAA Section 10(a)(1). We begin with

the allegations of fraud. Under FAA Section 10(a)(1), which permits vacatur of an arbitration award when "the award was procured by ... fraud," 9 U.S.C. § 10(a)(1), we apply a three-part test: (1) "[T]he movant must establish the fraud by clear and convincing evidence"; (2) "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration"; and (3) "the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (citations omitted).

It is undisputed that the heightened pleading standards of Rule 9(b) apply to Reach's claim that Kaiser committed fraud. Federal Rule of Civil Procedure 9(b) "plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citations omitted). "Notably, the '[f ]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint.' " *Id.* (alteration in original) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam)).

**\*7** First, Reach fails to establish "precisely what statements or omissions were made in which documents or oral representations." *Id.* In essence, Reach alleges that Kaiser told Reach one figure for the QPA and told C2C another figure during the IDR process. But the entirety of Reach's allegations regarding the figures includes the following:

4. The patient was insured through Kaiser, with which REACH is OON. Kaiser paid REACH $24,813.48 for the transport, representing to REACH that the amount "allowed" on its Explanation of Benefits ("EOB") for the claim was its QPA.

...

28. On April 21, 2022, Kaiser issued an EOB for the California transport. It "allowed" $24,813.48 and paid the claim accordingly (minus a $250.00 copay). The charges

were coded as "claim paid at allowed amount." There was no explanation of why/how the amount was selected. Kaiser represented to REACH that the amount allowed was its QPA for the claim.

...

34.... Kaiser's offer on the claim was the amount it represented to REACH was its QPA. By submitting a lower QPA to C2C, Kaiser misled C2C into believing it was offering an amount higher than its QPA. C2C reviewed this amount and then applied an illegal presumption in favor of the QPA, selecting the offer closest to the QPA and requiring REACH to prove that "a higher OON rate" than the QPA was warranted. Naturally, this resulted in a decision in favor of Kaiser.

35. Kaiser has developed a scheme to minimize payments on air ambulance transports by misrepresenting the amount of its QPA to providers and IDR entities. Kaiser furthers the scheme by concealing information essential to understanding what its QPA actually is and how it was calculated. This is all done so no one can question Kaiser's QPA methodology, which results in two different QPAs, each of which wildly differs from market rates. Kaiser is securing IDR awards through undue means.

The only allegation in the Complaint regarding the content of the first statement is, "Kaiser represented to REACH that the amount allowed was its QPA for the claim." The Complaint does not provide any further details about how this representation was made, or whether the alleged representation that "the amount 'allowed' on its Explanation of Benefits ... for the claim was its QPA" was made in the same EOB document or in a separate document.

Additionally, the Complaint does not allege "the time and place of each such statement and the person responsible for making ... them." *FindWhat Inv. Grp.*, 658 F.3d at 1296. It says only that the EOB was issued on April 21, 2022. The Complaint does not explain the place where either fraudulent statement was made, nor does it allege the time of the second statement, only that Kaiser submitted a different and lower QPA of $17,304.29 to C2C.

The Complaint also does not explain "the manner in which [the fraudulent statements] misled the plaintiff." *Id.* By Reach's own admission, "[b]ecause the purported QPA [initially offered by Kaiser] was far below reasonable market

rates, REACH initiated the Open Negotiation Period." In other words, Reach was not misled by Kaiser's figure at all. Instead, Reach recognized that Kaiser's purported QPA was "far below reasonable market rates," which caused Reach to initiate the negotiation process under the NSA. Had Kaiser supplied to Reach what Reach refers to as the later QPA figure of $17,304.29, it would have been even more obvious that the offered QPA was far below market rate.

**\*8** Finally, the Complaint does not articulate what Kaiser obtained as a result of the alleged fraud. Reach never explains how Kaiser's alleged misrepresentation of the QPA -- to Reach or to C2C -- is connected to C2C's ultimate selection of Kaiser's figure. The Complaint alleges that "[t]he NSA requires arbitrators to consider certain categories of information in determining the appropriate OON," and that "[t]he QPA is only one such piece of information." According to Reach, arbitrators must also consider the following information:

• the quality and outcomes measurements of the provider that furnished the services;

• the acuity of the individual receiving the services or the complexity of furnishing such services to such individual;

• the training, experience, and quality of the medical personnel that furnished the services;

• ambulance vehicle type, including the clinical capability level of such vehicle;

• population density of the pick up location (such as urban, suburban, rural, or frontier); and

• demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4 plan years.

However, these are exactly the same factors -- in almost the exact same language -- C2C said it considered in its IDR determination, which states:

In determining which offer to select, the IDRE must consider:

A. The qualifying payment amount (QPA) for the applicable year for the same or similar item or service.

B. Additional related and credible information relating to the offer submitted by the parties.

Parties may submit additional information regarding any of the six circumstances, which include:

1. The quality and outcomes measurements of the provider of air ambulance services that furnished the services.

2. The acuity of the condition of the participant, beneficiary, or enrollee receiving the service, or the complexity of furnishing the service to the participant, beneficiary, or enrollee.

3. The level of training, experience, and quality of the medical personnel that furnished the air ambulance services.

4. The air ambulance vehicle type, including the clinical capability level of the vehicle.

5. The population density of the point of pick-up for the air ambulance (such as urban, suburban, rural, or frontier).

6. Demonstrations of good faith efforts (or lack thereof ) made by the OON provider of air ambulance services or the plan to enter into network agreements, as well as contracted rates between the provider and the plan during the previous four plan years.

Notably, C2C's IDR determination explicitly acknowledges that the parties submitted this information and that C2C considered it:

> As noted above, the IDRE must consider related and credible information submitted by the parties to determine the appropriate OON rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. However, the information submitted did not support the

allowance of payment at a higher OON rate.

Thus, C2C never said that the QPA was dispositive, that the QPA overrode the other pieces of evidence considered, or that the amount of Kaiser's offer is what C2C would have come up with in a vacuum. Instead, C2C considered evidence regarding multiple factors, including but not limited to the QPA, and it ultimately determined that Kaiser's offer was the better one. Accordingly, Reach has failed to sufficiently allege that the arbitration award was procured through fraud.

**\*9** Next, the Complaint fails to sufficiently allege that Kaiser procured the arbitration award through undue means. Although we have never defined "undue means" under the Federal Arbitration Act, other Courts of Appeals have limited undue means to those actions "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator or other improper influence." *Am. Postal Workers Union v. U.S. Postal Serv.*, 52 F.3d 359, 362 (D.C. Cir. 1995); *accord* *Hoolahan v. IBC Advanced Alloys Corp.*, 947 F.3d 101, 112–13 (1st Cir. 2020); *Guardian Flight, L.L.C. v. Med. Evaluators of Tex. ASO, L.L.C.*, 140 F.4th 613, 622 (5th Cir. 2025); *PaineWebber Grp., Inc. v. Zinsmeyer Trs. P'ship,* 187 F.3d 988, 991 (8th Cir. 1999). At most, the Complaint asserts only that Kaiser submitted a different figure to C2C during IDR than it did to Reach before the IDR had commenced. The allegations fall far short of alleging that Kaiser used undue means, on the level of "physical threat to an arbitrator," *Am. Postal Workers Union,* 52 F.3d at 362, to procure the IDR award.

We also note that the use of the process of baseball-style arbitration in IDR means that the selection of Kaiser's figure may have been the result of Reach's offer being unreasonably high. Thus, for example, suppose that C2C determined that the value of Reach's services was $30,000 and that Kaiser had submitted the same offer figure of $24,813.48. Had Reach offered $29,000, C2C would have chosen Reach's figure, since the number would be closer to the actual value of Reach's services provided. But because Reach submitted an offer for $52,474.60 -- far above the hypothetical value determined by C2C -- C2C instead went with Kaiser's lower figure. In this way, baseball-style arbitration would have worked exactly as intended: incentivizing both parties to eschew extreme offers that the arbitrator would be more likely to reject.

Finally, we observe that the parties agree it is not procedurally necessary to name C2C as a defendant in this case, provided that the district court has the authority to order the IDR entity to perform a new arbitration in the event it vacates the IDR award. It is undisputed that, under the NSA, the district court does have such authority, and may remand the case back to the IDR entity to start arbitration again, should it find that one of the grounds in 9 U.S.C. § 10(a)(1)–(4) has been satisfied. Because having the arbitrator as a defendant in the case is not necessary for a party to bring a challenge to an IDR award, we affirm the district court's dismissal of C2C from the case. We need not and do not decide whether the NSA creates a cause of action against certified IDR entities.

**AFFIRMED.**

**All Citations**

--- F.4th ----, 2025 WL 3222820

---

## Footnotes

1   A similar suit was filed in the same district court a few weeks earlier by Med-Trans Corporation against C2C and Capital Health Plan, Inc. The district court addressed the motions to dismiss in that case at the same time it addressed the motions to dismiss in this case. Med-Trans also appealed the district court's ruling to our Court (Case No. 24-10134), but the parties settled that case and filed a motion to voluntarily dismiss their appeal, which we granted on May 30, 2024.

2   Reach contends that a different subsection of the NSA supplies independent grounds for vacating an arbitration award. Reach cites subsection (I) of 42 U.S.C. § 300gg-111(c)(5)(E)(i), which instructs that

2025 WL 3222820

an IDR entity's determination "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of fact[ ]." ⚑42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). Reach insists that by declaring an arbitration award to be nonbinding where "evidence of misrepresentation of facts presented to the IDR entity" is present, subsection (I) implicitly provides a distinct cause of action to challenge an arbitration award under the NSA. The district court supplied several compelling reasons to reject this reading. As discussed below however, *see infra* at pp. —— – ——, even if we were to adopt Reach's reading of subsection (I), because the Complaint's allegations fail to describe Kaiser's fraud or intentional misrepresentations with sufficient particularity under ⚑Rule 9(b), vacatur would still be improper under the NSA.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---