IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BLUE CROSS BLUE SHIELD
HEALTHCARE PLAN OF GEORGIA,
INC.,

     Plaintiff,

        v.

HALOMD, INC., et al.,

     Defendants.

CIVIL ACTION FILE
NO. 1:25-CV-2919-TWT

## OPINION AND ORDER

This is a No Surprises Act ("NSA") case. It is before the Court on

Defendants Sound Physicians Emergency Medicine of Georgia, P.C.'s and

Hospitalist Medicine Physicians of Georgia TCG, PC's[1] Motion to Dismiss

[Doc. 45] and Defendant HaloMD, Inc.'s ("HaloMD's") Motion to Dismiss [Doc.

47]. For the reasons stated below, the Provider Defendants' Motion to Dismiss

[Doc. 45] and Defendant HaloMD's Motion to Dismiss [Doc. 47] are GRANTED.

### I.    Background[2]

This case arises out of disputes related to the arbitration process created

by the No Surprises Act. The Plaintiff generally alleges that the Defendants

---

[1] As the Plaintiff does in its Amended Complaint, the Court will refer to
Defendants Sound Physicians and Hospitalist Medicine Physicians collectively
as the "Provider Defendants."

[2] The Court accepts the facts as alleged in the Amended Complaint as
true for purposes of the present Motion to Dismiss. *Wilding v. DNC Servs.
Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019).

T:\ORDERS\25\Blue Cross Blue Shield\mtdtwt_cbiedits.docx

conspired to defraud the Plaintiff through abuse of the NSA Independent Dispute Resolution process. (*See* Am. Compl. ¶¶ 2-10 [Doc. 43]).

## A. The Parties

The Plaintiff is licensed as a Health Maintenance Organization in Georgia and offers a broad range of health care plans, insurance contracts, and services to its plan sponsors, members, and insureds who enroll in their plans. (*Id.* ¶¶ 11, 19). Defendant HaloMD is a company that operates "with an exclusive focus on Independent Dispute Resolution ("IDR")" and solicits and represents physician practices throughout the United States, including in Georgia. (*Id.* ¶¶ 6, 12). The Provider Defendants are affiliates of Sound Physicians, a national hospital staffing company, which advertises itself as a multi-specialty practice group with over 4,000 medical professionals that partners with more than 400 hospitals across the United States and manages approximately six percent of all acute medical hospitalizations. (*Id.* ¶¶ 13-16). While the Provider Defendants are both Georgia Professional Corporations, they were incorporated by individuals located in Tacoma, Washington, where Sound Physicians is headquartered. (*Id.* ¶¶ 13-14, 16).

## B. Pre-NSA Insurer-Provider Disputes

Generally, health insurers like the Plaintiff contract with a network of healthcare providers from whom their members may obtain "in-network" care. (*Id.* ¶ 26). These contracts govern the rate for relevant services and prohibit

healthcare providers from billing patients above the amount agreed upon by the parties. (*Id.*). But members also have the option to obtain treatment from "out-of-network" healthcare providers. (*Id.*). These providers do not have contracts with the relevant health insurer, which often results in members paying more for the services provided to them. (*Id.*).

Health care needs are not always predictable, and emergencies happen when individuals least expect it. (*See id.* ¶ 27). At times, members may not be able to choose between an in-network and out-of-network provider when they suffer a medical emergency and receive treatment from the nearest emergency room. (*Id.*). Also, the hospital could be in-network but the member is treated by an out-of-network physician. (*Id.*). In such cases, out-of-network providers would often charge patients inflated rates as part of a practice known as "surprise billing." (*Id.* ¶¶ 27-28). Because patients and health insurers would have little to no choice but to pay the inflated rates, surprise billing became a growing problem. (*Id.* ¶¶ 28-29).

## C. The NSA

In 2020, Congress began crafting a solution to combat the growing practice of surprise billing. (*See id.* ¶ 30). It considered surprise billing "a 'market failure' that was having 'devastating financial impacts on Americans and their ability to afford needed health care.'" (*Id.* (quoting H.R. Rep. No. 116-615, at 52 (2020))). Congress ultimately passed the NSA, which became

effective as of January 2022. (*Id.* ¶¶ 30-31).

The NSA banned surprise billing for three categories of out-of-network care: "(1) emergency services; (2) non-emergency services by out-of-network providers at in-network facilities; and (3) air ambulance services." (*Id.* ¶ 31 (citing 42 U.S.C. § 300gg-131, then citing 42 U.S.C. § 300gg-132, then citing 42 U.S.C. § 300gg-135)). The NSA also created a framework outside of the judicial process for health insurers and providers to resolve specific types of billing disputes that arise from the provision of these specific healthcare services. (*Id.* ¶ 32 (citing 42 U.S.C. § 300gg-111(c))). The framework imposes "(1) open negotiations – a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for 'qualified IDR items and services' if no agreement is reached; and (3) if applicable, a binding payment determination from private parties called certified IDR entities ("IDREs")." (*Id.*).

Under this framework, when a health plan receives a claim for out-of-network services subject to the NSA, the health insurer will make an initial payment or issue a notice of denial of payment within 30 days. (*Id.* ¶ 33 (citing 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I)). If the out-of-network provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health insurer by providing formal written notice to the insurer within 30 business days of the initial payment or notice of denial. (*Id.* ¶ 34 (citing 42 U.S.C. § 300gg-111(c)(1)(A))). Both parties must

engage in good faith negotiations during this process. (*Id.* (citing 42 U.S.C. § 300gg-111(c)(1)(A))).

If the parties fail to reach an agreement, a healthcare provider may initiate the IDR process within four business days of the conclusion of the open negotiations period. (*Id.* ¶ 35 (quoting and citing 42 U.S.C. § 300gg-111(c)(1)(B), then citing 45 C.F.R. § 149.510(b)(2)(i))). After the provider initiates the IDR process, the parties select, or the Department of Health and Human Services appoints, an IDRE. (*Id.* ¶ 63 (citing 42 U.S.C. § 300gg-111(c)(4)(F))). The IDRE performs two tasks. (*Id.*). First, the IDRE must "'determine whether the Federal IDR process applies'" by reviewing "'the information submitted in the notice of IDR initiation.'" (*Id.* ¶ 64 (quoting 45 C.F.R. § 149.510(c)(1)(v)). Second, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. (*Id.* ¶ 65 (citing 42 U.S.C. § 300gg-111(c)(5)(A))). Under this process, the parties each submit their offer and the IDRE selects one party's offer as the out-of-network rate after considering a calculation methodology prescribed by federal regulation, which approximates the insurer's median in-network contracting rate for the services along with the provider's training, experience, quality, and market share and the patient's acuity, among others. (*Id.* ¶¶ 66-67 (citing 42 U.S.C. §§ 300gg-111(c)(5)(B), (C))). IDREs cannot consider, amongst other variables, the provider's charges. (*Id.* ¶ 67 (citing 42 U.S.C. § 300gg-111(c)(5)(D))).

Ultimately, an IDR determination is binding in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDRE involved regarding such claim. (*Id.* ¶ 68 (citing 42 U.S.C. § 300gg-111(c)(5)(E)(i))). Judicial review of the IDRE determination is only permitted under circumstances specified in the Federal Arbitration Act (9 U.S.C. §§ 10(a)(1)-(4)): (1) "where the award was procured by corruption, fraud, or undue means;" (2) "where there was evident partiality or corruption in the [IDREs];" (3) "where the [IDREs] were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or" (4) "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." (*Id.* ¶ 71 (quoting 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II), then quoting 9 U.S.C. §§ 10(a)(1)-(4))).

## D. Process and Safeguards in Initiating IDR

In order to initiate the IDR process, a provider must go to a federal website called the "IDR Portal." (*Id.* ¶ 44). The first page of the website specifies that parties may use the IDR Portal if they participated in an open negotiation period that expired without an agreement for a qualified IDR item or service. (*Id.* ¶ 47). Under the NSA, a qualified IDR item or service must meet

6

the following conditions: (1) it must be an item or service within the NSA's scope and also of a coverage type subject to the NSA; (2) a "specified state law" does not apply to the dispute; (3) the underlying services were covered by the patient's health benefit plan; (4) the patient did not waive the NSA's balance billing protections; (5) the provider initiated and exhausted open negotiations; (6) the provider initiated the IDR process within four business days after the open negotiations period ended; and (7) the provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days. (*Id.* ¶ 37 (citing 42 U.S.C. § 300gg-111(c)(1)(B), then citing 45 C.F.R. §§ 149.510(a)(2)(xi), (b)(2))). For the second requirement, a "specified state law" is defined by the NSA as a state law that provides for "'a method for determining the total amount payable under such a plan, coverage, or issuer, respectively . . . in the case of a participant, beneficiary, or enrollee covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility.'" (*Id.* ¶ 38 (quoting 42 U.S.C. § 300gg-111(a)(3)(I), then quoting 45 C.F.R. 149.30)). In any case, the website also provides a link to a list of state laws that render certain disputes ineligible for the IDR process. (*Id.* ¶ 47).

Before initiating the IDR process, parties must agree to certain terms and conditions that include a notice that the initiating party must submit an attestation that the IDR items and services are within the scope of the Federal

7

IDR process. (*Id.* ¶ 48). After agreeing to the terms and conditions, providers must then answer certain questions to determine whether the dispute is eligible for IDR. (*Id.* ¶ 49). If the dispute is not eligible, the form will provide an alert and prevent the initiating party from proceeding. (*Id.* ¶¶ 49-50). Once the questions have been answered, a provider must complete the Notice of IDR Initiation, where it must provide a variety of relevant information, such as the name and contact information of the healthcare provider, the claim number, the date of the service, the median in-network rate for the same service in the same geographic area for the qualified IDR item or services at issue, and documentation supporting these facts. (*Id.* ¶ 54). At the end of the process, the provider must attest that the items and services are qualified items and services within the scope of the Federal IDR process. (*Id.* ¶ 55). The system then sends all the information to the insurer. (*Id.* ¶ 56). In addition to these federal safeguards, the Plaintiff also informs providers whenever certain items and services are ineligible for IDR before they initiate any proceedings. (*Id.* ¶ 59).

### E. Alleged Fraudulent Scheme

Beginning no later than January 2024, the Plaintiff alleges that the Defendants conspired to defraud the Plaintiff by fraudulently submitting thousands of ineligible IDR disputes to the Plaintiff. (*Id.* ¶ 72). According to the Plaintiff, the Defendants' scheme involved three related tactics. (*Id.* ¶ 76).

First, the Defendants made repeated false statements, representations, and attestations of IDR eligibility to the Plaintiff and the IDREs. (*Id.*). The Defendants submitted false attestations through the IDR Portal, claiming eligibility for disputes involving (1) services and disputes governed by a specified state law under the meaning of the NSA; (2) Medicaid- or Medicare-governed services for which the NSA does not apply; (3) services not covered by the patient's plan; (4) disputes for which the Defendants failed to initiate or pursue open negotiations; and (5) disputes already resolved or time-barred. (*Id.* ¶ 74). This meant that, despite the safeguards present on the IDR Portal, the Defendants knowingly falsely attested to the eligibility of clearly ineligible disputes throughout the questionnaire and in the face of information presented within the IDR Portal and by the Plaintiff. (*See id.* ¶¶ 79-89).

Second, the Defendants manipulated the IDR process by strategically submitting massive numbers of open negotiations and IDR initiations, most of which are ineligible for IDR, to overwhelm the ability of the Plaintiff to contest claims, confuse and swamp IDREs, and manipulate the IDR process. (*Id.* ¶76). With the use of artificial intelligence, Defendant HaloMD, on behalf of and in coordination with the Provider Defendants, flooded the IDR system with fraudulent disputes, deliberately overwhelming IDR safeguards and enabling erroneous payments. (*Id.* ¶ 75). During the last six months of 2024, Defendant

HaloMD initiated 134,318 disputes through the IDR process, exceeding the government's original estimate for total annual disputes more than sixfold. (*Id.* ¶¶ 92, 95). In other words, Defendant HaloMD was initiating an average of more than 746 disputes against health plans per day. (*Id.* ¶ 95). A large number of these disputes were directed against the Plaintiff. For example, on one day in May 2024, the Defendants initiated 228 separate IDR proceedings against the Plaintiff. (*Id.* ¶ 97). The Plaintiff's "records" showed that more than 80% of these disputes were ineligible for IDR but the Plaintiff still lost in 192 of the disputes. (*Id.*).

Finally, the Defendants submitted false and inflated requests for payment that they could never receive on the open market, including many that exceeded the Provider Defendants' own billed charges. (*Id.* ¶ 76). Although IDREs are tasked to make payment determinations according to certain federal standards, IDRE payment determinations skew heavily in favor of providers. (*Id.* ¶ 104). In the most recent reporting period, providers prevailed in 85% of IDR payment determinations and prevailing offers exceeded federal standards 85% of the time. (*Id.* ¶ 105). Knowing this, the Defendants made inflated offers to take advantage of this flaw within the system. (*See id.* ¶¶ 106-110).

The Plaintiff alleges that the Defendants conducted the activities of an association-in-fact enterprise by functioning as a continuing unit with

10

established duties. (*Id.* ¶¶ 115-16). Defendant HaloMD is the hub of the Defendants' scheme. (*Id.* ¶119). In the course of its business, Defendant HaloMD solicited and represented many different types of out-of-network providers who need to go through the IDR process. (*Id.* ¶¶ 120-21). They did so by gathering and organizing the necessary documentation from the providers and preparing a compelling case that highlights the provider's position, using artificial intelligence. (*Id.* ¶¶ 122-24). Defendant HaloMD also had a financial incentive to cut corners in the IDR process because it operated on a commission-based reimbursement model, where it does not get paid unless the provider gets paid. (*Id.* ¶ 125). In order to increase financial gains, it brought in as many services as possible through the IDR process regardless of their merit and sought the highest possible monetary award. (*Id.*).

The Provider Defendants were two of Defendant HaloMD's clients and were co-conspirators within the fraudulent scheme. The Provider Defendants shared resources and intermingled operations with respect to IDR claims. (*Id.* ¶ 130). While Sound Physicians filed some of the IDR initiations on behalf of the Provider Defendants, Defendant HaloMD filed others. (*Id.* ¶¶ 130-31). In both cases, the "same pattern of systemic initiation of faulty and ineligible disputes" existed, showing that their operations were commingled. (*Id.* ¶ 131). Once the Provider Defendants coordinated with Defendant HaloMD, they were able to maximize their fraudulent scheme together by concealing each other's

11

involvement. (*Id.* ¶¶ 131-32). Ultimately, the Plaintiff was harmed from this coordination.

### F. Procedural History

The Plaintiff filed its Complaint with this Court to recover damages for the injuries it suffered from the Defendants' fraudulent scheme. (*See generally* Compl. [Doc. 1]). The Amended Complaint asserts both federal and state law claims. As to the federal claims, the Plaintiff seeks (1) civil relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (2) vacatur of the individual IDR awards made by the IDREs, or (3) equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA"). (*See* Am. Compl. ¶¶ 161-94, 250-62). As to the Georgia law claims, the Plaintiff seeks civil relief for claims under (1) Georgia's RICO statute, (2) fraudulent misrepresentation, (3) negligent misrepresentation, (4) statutory fraud per O.C.G.A. § 51-6-2(a), (5) theft by deception, (6) civil conspiracy, and (7) the Georgia Deceptive Trade Practices Act. (*See id.* ¶¶ 195-249). The Defendants now move to dismiss all claims against them for lack of subject-matter jurisdiction, personal jurisdiction, and for failure to state a claim. (*See generally* Provider Defs.' Mot. to Dismiss [Doc. 45]; Def. HaloMD's Mot. to Dismiss [Doc. 47]).

## II.    Legal Standards

A complaint should be dismissed under Rule 12(b)(1) only where the court lacks jurisdiction over the subject matter of the dispute. Fed. R. Civ. P. 12(b)(1). Attacks on subject matter jurisdiction come in two forms: "facial attacks" and "factual attacks." *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260 (11th Cir. 1997). Facial attacks on the complaint "require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* at 1261 (citation modified). On a facial attack, therefore, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Garcia*, 104 F.3d at 1261 (quotation marks omitted). On a factual attack, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Scarfo v. Ginsberg*, 175 F.3d 957, 960–61 (11th Cir. 1999) (quotation marks and citation omitted).

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff has the burden of establishing a prima facie case by

13

presenting enough evidence to withstand a motion for directed verdict." *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1356 (11th Cir. 2021). In evaluating a plaintiff's case, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). Where the defendant contests the allegations of the complaint through affidavits, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). "And where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must draw all reasonable inferences in the plaintiff's favor." *Mortg. Invs.*, 987 F.3d at 1356 (quotation marks omitted).

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim; however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the Court

must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III.   Discussion

The Defendants make several arguments in favor of dismissal of the claims against them. The Court will address the subject matter and personal jurisdiction arguments first before addressing the substantive arguments.

### A. Subject Matter Jurisdiction

#### 1. Article III Standing

Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. *Florence Endocrine Clinic, PLLC v. Arriva Medical, LLC*, 858 F.3d 1362, 1365 (11th Cir. 2017) (citing U.S. Const. Art. III, § 2). This means that any plaintiff filing a complaint in federal court must

15

establish that they have standing to sue. *Id.* at 1365-66 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). A plaintiff must demonstrate three elements to establish Article III standing: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 1366 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Defendant HaloMD asserts that the Plaintiff lacks Article III standing to pursue relief against it. (*See* Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 13-17 [Doc. 47-1]). Specifically, Defendant HaloMD argues that the Plaintiff cannot satisfy the traceability element against it under the facts alleged in the Amended Complaint. (*See id.* at 14). It does not dispute whether the Plaintiff alleged an injury in fact or whether the Court can redress the Plaintiff's injuries. This is for good reason. The Plaintiff asserts damages arising out of lost time and money. (*See e.g.* Am. Compl. ¶¶ 4, 9, 73, 97-99, 111). As the Eleventh Circuit puts it, these are "garden-variety injuries in fact under Article III" that a court can easily redress. *Walters v. Fast AC, LLC*, 60 F.4th 642, 649 (11th Cir. 2023). Thus, the Court will now turn to the issue of traceability.

"To satisfy the traceability requirement, a plaintiff must establish a 'causal connection between the injury and the conduct complained of.'" *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 926 (11th Cir. 2023)

16

(quoting *Lujan*, 540 U.S. at 560). "Proximate causation is not a requirement of Article III standing." *Wilding*, 941 F.3d at 1125 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n. 6 (2014) (citation modified)). "A plaintiff therefore need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* at 1126 (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). A plaintiff fails to satisfy traceability when "the plaintiff 'would have been injured in precisely the same way' without the defendant's alleged misconduct." *Walters*, 60 F.4th at 650.

Defendant HaloMD argues that the Plaintiff's claims fail traceability for two reasons. First, it argues that it did not render the IDR awards or make binding determinations so the injury cannot be traceable to it since the IDREs are independent neutrals and decide eligibility for themselves. (Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 14-15). Second, Defendant HaloMD claims that the crux of the Plaintiff's dispute lies with the structure of the NSA itself and not the Defendants. (*Id.* at 16-17).

Neither argument is persuasive. The standard to satisfy Article III traceability is light and does not require the Plaintiff to allege that the Defendants directly performed the action that resulted in the injury. *See Walters*, 60 F.4th at 650. As long as the Plaintiff alleges that the Defendants contributed in a way that ultimately caused the injury, that is enough to satisfy

17

Article III standing. *See Wilding*, 941 F.3d at 1126. The Plaintiff does so here. In order to initiate the IDR process, the Defendants must go to a federal website called the "IDR Portal" and fill out certain forms. (*See* Am. Compl. ¶ 44-59). The Amended Complaint alleges that the Defendants misrepresented the eligibility of several items and services to the IDREs through this portal. (*See id.* ¶¶ 79-89). The pleadings also allege that IDREs, while neutral, are influenced by these false misrepresentations in determining whether the dispute is eligible for IDR. (*See id.* ¶¶ 100-02). Once within the process, the Defendants then submitted inflated offers in the arbitration proceedings and the Plaintiff was ultimately damaged from the result. (*See id.* ¶¶ 103-32).

Without the Defendants initiating the IDR process, the Plaintiff would never have been injured under the Defendants' alleged fraudulent scheme. The Plaintiff has also sufficiently alleged that the Defendants' false attestations are, in part, responsible for its injuries. Accordingly, the Court concludes that the Plaintiff has Article III standing to bring its claims.

### 2. Scope of Judicial Review Under the NSA

The Provider Defendants assert that the Plaintiff cannot obtain judicial review of IDR rulings outside of its claim for vacatur. (*See* Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 23-26 [Doc. 45-1]). The Plaintiff disagrees and makes its argument in three parts. First, it argues that the NSA's limitation on judicial review only applies to an IDRE's *payment* determination,

18

not *eligibility* determinations and therefore its claims outside of vacatur can proceed. (*See* Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 22-26 [Doc. 50]). Second, the Plaintiff argues that, even if the limitation applies to eligibility determinations, it can assert remedies outside of vacatur. (*See id.* at 26-29). Third, the Plaintiff argues that its remaining claims are not collateral attacks on IDR determinations and should prevail. The Court will address each issue accordingly.

### a. Judicial Review of Eligibility Determinations

The United States Constitution provides Congress the power to establish federal courts and limit their jurisdiction. *See* U.S. Const. Art. III, § 1. When a party to litigation argues that a Congressional statute limits a federal court's ability to engage in judicial review, courts apply a "strong presumption" that the statute permits judicial review. *Bourdon v. United States Dep't of Homeland Sec.*, 940 F.3d 537, 545 (11th Cir. 2019) (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016)). "And, like all other presumptions used in interpreting statutes, it 'may be overcome by 'clear and convincing' indications, drawn from 'specific language' in the statute showing 'that Congress intended to bar review.'" *Id.* (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016).

As always, "statutory interpretation analysis begins and ends with the statutory text." *United States v. Pate*, 43 F.4th 1268, 1271 (11th Cir. 2022)

19

(citation modified), *rev'd en banc on other grounds*, 84 F.4th 1196 (2023). Thus, the Court turns to the NSA's limitation on judicial review. The relevant provision states that "[a] determination of a certified [IDRE] under subparagraph (A) . . . shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of Section 10(a) of [the Federal Arbitration Act ("FAA")]. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Looking at the FAA, the IDRE's determination is judicially reviewable:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the [IDRE], or either of them;
>
> (3) where the [IDREs] were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the [IDRE] exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §§ 10(a)(1)-(4); *id.*

But, as the Plaintiff emphasizes, it is important to understand what actions are permitted under subparagraph (A). The provision states:

> **(5) Payment determination**
>
> **(A) In general**
>
> Not later than 30 days after the date of selection of the

certified [IDRE] with respect to a determination for a qualified IDR item or service, the [IDRE] shall--

(i) taking into account [statutory mandated considerations], select one of the offers submitted [by the parties to the IDR proceeding] to be the amount of payment for such item or service . . .; and

(ii) notify the provider or facility and the group health plan or health insurance issuer offering group or individual health insurance coverage party to such determination of the offer selected under clause (i).

42 U.S.C. § 300g-111(c)(5)(A).

If the Court ended its inquiry here, the Plaintiff's interpretation of the NSA might be correct. But this ignores a clear outstanding question. Under what authority can an IDRE make eligibility determinations? After all, the NSA does not explicitly grant any entity this right anywhere. But despite its absence in the statute, the Secretary for the Department of Health & Human Services (the "Secretary") still grants IDREs the power to review whether an item or service is eligible for IDR. *See* 45 C.F.R. § 149.510(c)(1)(v).

There are two provisions of the NSA that delegate IDR management to the Secretary. First, the NSA empowers the Secretary to create regulations intended to establish an IDR process consistent with the rules set out within the statute. *See* 42 U.S.C. § 300g-111(c)(2)(A). As the Plaintiff admits, this includes the ability to classify what items and services qualify for the IDR process. *See id.*; (Am. Compl. ¶ 37). Second, the NSA empowers the Secretary

21

to establish a process to certify IDREs for use in the IDR process. *See* 42 U.S.C. § 300g-111(c)(4). In effect, these two provisions allow the Secretary to create rules and regulations pertaining to the entire IDR process.

As part of these regulations, the Secretary gave IDREs the power to review IDR initiation submissions and determine whether the IDR process can apply to the items or services at-dispute. *See* 45 C.F.R. § 149.510(c)(1)(v). The regulations treat this review as part of the selection process for IDREs, and the NSA allows the Secretary to make rules and regulations. *See* 45 C.F.R. § 149.510(c)(1) (titled "Selection of [IDRE]").

With this understanding, the Court returns to the aforementioned subparagraph (A) within the NSA. The first line requires a selection of the IDRE to occur "with respect to a determination of a qualified IDR item or service" before the IDRE can engage in the payment determination. *See* 42 U.S.C. § 300g-111(c)(5)(A). In other words, for there to be a payment determination under subparagraph (A), *there must be an eligibility determination. See id.*; 45 C.F.R. § 149.510(c)(1)(v). Thus, the Court concludes that the NSA's limitation on judicial review applies both to payment determinations and eligibility determinations under the text of the statute.

This reading comports with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *F.D.A. v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), *superseded by statute on other grounds*, Family Smoking Prevention and Tobacco Control Act of 2009, 123 Stat. 1776, *as recognized in F.D.A. v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 550-52 (2025) (citation modified). Further, the interpretation is consistent with three fundamental principles underlying the Eleventh Circuit's recent decision in *Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc.*, 160 F.4th 1110 (11th Cir. 2025). There, the Court of Appeals considered an IDR dispute between an insurance company and a provider of air ambulance services under the NSA. *Id.* at 1114-15.

First, the Eleventh Circuit acknowledged that the purpose behind the IDR process within the NSA was to create an efficient and streamlined vehicle for disputes that would minimize costs for all parties involved. *Id.* at 1119. Second, the Eleventh Circuit noted that the district court's reading of the NSA, which found that the only grounds for vacatur of an IDR award arose out of 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II), was compelling. *Id.* at 1118 n. 2; *see also Med-Trans Corp. v. Capital Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1085-86 (M.D Fla. 2023) ("[S]ubsection (II) is the final word on reviewability. It contains exclusive language— 'shall not be subject to judicial review, except' —and lists § 10(a) of the FAA as supplying the only grounds for judicial review."). Finally, the Eleventh Circuit interpreted the judicial review provision consistent with the FAA and noted that a court "may vacate an arbitrator's decision 'only in

23

very unusual circumstances'" and that "'federal courts should defer to an arbitrator's decision whenever possible.'" *Reach Air Med. Servs.*, 160 F.4th at 1119 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013), then quoting *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010)). It is for similar reasons that at least one other court has refused to split eligibility determinations from the ultimate payment determination when determining whether a plaintiff can pursue judicial review of that element outside of the NSA's express limitation. *See, e.g., Anthem Blue Cross Life and Health Ins. Co. v. HaloMD LLC*, 2026 WL 982629, at *9 (C.D. Cal. Apr. 9, 2026) ("An IDRE's payment determination necessarily includes a determination of eligibility.").

But even from a policy perspective, the Plaintiff's statutory interpretation argument fails. If Congress intended to allow attacks on eligibility without judicial review, it ultimately would defeat Congress' intent to create a streamlined dispute resolution process. If eligibility determinations were to be excluded from any judicial review limitation within the NSA, the losing party could simply run to the courts and attempt to subvert the IDRE's determination by mounting a collateral attack. Not only would this result in increased costs to the parties, but it would also defeat any notions of efficiency in the "baseball-style arbitration" that Congress envisioned. Considering the plain text of the statute, Eleventh Circuit case law on the NSA, and Congress'

24

intent underlying the IDR process, the Court concludes that the NSA's limitation on judicial review applies to both eligibility and payment determinations.

### b. Vacatur as an Exclusive Remedy Under the NSA

The Provider Defendants argue that the Plaintiff's exclusive remedy under the NSA's judicial review provision is a request for vacatur and that the Plaintiff must follow the FAA's procedural requirements in pursuing vacatur. (*See* Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 24-36). The Provider Defendants are correct that the Plaintiff's only avenue to challenge the IDRE determination is through vacatur.

The Court reviews the NSA's text once more. The NSA's judicial review provision states that an IDRE's determination "shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). These paragraphs in the FAA discuss certain circumstances in which a court may vacate an award from an arbitrator. *See* 9 U.S.C. §§ 10(a)(1)-(4). It is the only avenue within the NSA by which a private plaintiff may challenge an IDR determination with all other judicial review being prohibited. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

This leaves open a key question; what is the scope of the term "judicial review" as used within the NSA's provision?  The Fifth Circuit's decisions in

25

*Guardian Flight, L.L.C. v. Med. Evaluators of Tex. ASO, L.L.C.*, 140 F.4th 271 (5th Cir. 2025) ("*Guardian Flight I*") and *Guardian Flight, L.L.C. v. Med. Evaluators of Tex. ASO, L.L.C.*, 140 F.4th 613 (5th Cir. 2025) ("*Guardian Flight II*") are instructive. There, the plaintiffs asserted that the NSA permits them to seek judicial enforcement of an IDR award outside of the four scenarios listed within the NSA's judicial review provision. *Guardian Flight* I, 140 F. 4th at 275. The court noted that the term "review" within the limitation provision includes the "'[p]lenary power *to direct and instruct an agent or subordinate*, including the right to remand, modify, or vacate any action by the agent or subordinate, or to act directly in place of the agent or subordinate.'" *Id.* (quoting *Review*, Black's Law Dictionary (12th ed. 2024) (emphasis in original)); *see also Judicial Review*, Black's Law Dictionary (12th ed. 2024) ("A court's power to review the actions of other branches or levels of government; esp., the courts' power to invalidate legislative and executive actions as being unconstitutional."). The court understood this definition to include both the power to enforce and to vacate IDR awards. *Guardian Flight I*, 140 F.4th at 275 n. 3, 275-76; *Guardian Flight II*, 140 F.4th at 620.

Understanding that the term encompasses broad powers, the Fifth Circuit held that the NSA specifically foreclosed any private right of action outside of what was permitted in the four circumstances incorporated from the FAA. *See Guardian Flight I*, 140 F.4th at 276. The court noted that the NSA

26

does not incorporate any other section of the FAA outside of Section 10. *Id.* But the Fifth Circuit noted that in other statutes that incorporate the FAA, Congress has affirmatively incorporated procedural sections of the FAA. *Id.* (briefly discussing 5 U.S.C. § 580(c), where the statute incorporates sections 9 through 13 of the FAA). The Court of Appeals took this difference to mean that "Congress knew how to create a private right of action in the NSA—and has done so elsewhere—but declined to do so." *Id.* Ultimately, and more explicitly in *Guardian Flight II*, the Fifth Circuit concluded that "the NSA explicitly *bars* judicial review of [IDRE] awards, except with respect to four scenarios incorporated from the FAA." *Guardian Flight II*, 140 F.4th at 620 (citing *Guardian Flight I*, 140 F.4th at 274-75).

In summary, the Fifth Circuit's interpretation of the NSA in *Guardian Flight I* and *Guardian Flight II* forecloses a private right of action against an IDRE award unless it meets the four circumstances incorporated from the FAA. If the plaintiff shows that one of the four circumstances exists, then a plaintiff may potentially seek to enforce, vacate, or take any other action relating to the IDRE award. Here, the Plaintiff only brings a single count directly seeking judicial review of the IDRE's determination through vacatur within the whole Amended Complaint. (*See* Am. Compl. ¶¶ 250-54). So, while a plaintiff is not limited to only seeking vacatur under the NSA, the Plaintiff here only challenges the IDRE determination by seeking vacatur. Thus, the

27

Provider Defendants are technically correct that the Plaintiff's only avenue to attack the IDRE determination is through vacatur.

But the Provider Defendants err in asserting that the Plaintiff is subject to the procedural requirements for asserting vacatur under the FAA. As discussed in *Guardian Flight I*, the NSA only incorporates a single section from the FAA and does not incorporate other sections that may contain procedural requirements for a petition for vacatur. *See Guardian Flight I*, 140 F.4th at 276. At least one court within this Circuit arrived at this same result. In *Med-Trans Corp.*, the court confronted the similar question of whether the NSA incorporated the FAA's procedural rules in challenging the IDRE's determination. 700 F. Supp. 3d at 1082. After reviewing the pertinent provision, the court noted that, "although [the provision] explains the grounds upon which a party may challenge an award, it does not discuss how to raise this challenge." *Id.* at 1083 (emphasis in original). The court then notes that "the NSA does not invoke or discuss §§ 6, 9, 12, or any other sections of the FAA," where the procedural rules could be found. *Id.* Because "'courts must presume that a legislature says in a statute what it means and means in a statute what it says there,'" the court held that the FAA's procedural requirements for vacating an award are not incorporated. *Id.* (quoting *Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969 (11th Cir. 2016)). On appeal, the Eleventh Circuit ultimately acknowledged and affirmed the district court's

28

decision, though it did not address the question. *See Reach Air Med. Servs.*, 160 F.4th at 1117-24.

In sum, while the Plaintiff is limited under the Amended Complaint to challenging the IDRE determination under its vacatur count, the Plaintiff is not subject to the FAA's procedural requirements for asserting vacatur. But this conclusion only addresses the Plaintiff's claims that directly attack the IDRE determination. The Plaintiff's RICO claims, state-law claims, and ERISA claim target the Defendants instead of the actual IDRE determination. The Court addresses whether it has subject-matter jurisdiction over those claims next.

### c. Collateral Attacks

Acknowledging that the remaining claims are not direct attacks on the IDRE's determination, the Provider Defendants argue that the Court nonetheless does not have subject-matter jurisdiction over those claims because they amount to collateral attacks of the IDRE's determination. (*See* Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 35-36). Generally, "[w]hen reviewing an arbitration award . . . [a court] may revisit neither the legal merits of the award nor the factual determinations upon which it relies." *Wiand v. Schneiderman*, 778 F.3d 917, 926 (11th Cir. 2015). When a claim "'is in substance no more than a collateral attack on the [arbitration] award itself, it is governed by the provisions of the [FAA].'" *Vital Pharms. v. PepsiCo, Inc.*,

29

528 F. Supp. 3d 1295, 1303 (S.D. Fla. 2021) (quoting *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986) (brackets in original)). "'A party collaterally attacks an arbitration award by seeking to reverse the outcome in the subsequent proceeding or alleging that the party was harmed by a wrongful act's impact on the award.'" *Id.* (citation omitted). The Court now addresses whether each claim amounts to a collateral attack on the IDRE determination.

### i.   Civil RICO and Conspiracy (Counts 1 and 2)

Congress enacted RICO to prohibit racketeering activity connected to interstate commerce. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016). Under the statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The statute also makes it unlawful for any person to conspire to violate RICO. 18 U.S.C. § 1962(d). While generally a criminal statute, RICO allows a private party to assert a civil cause of action. Indeed, the statute provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

30

"To recover [on a RICO claim], a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray*, 836 F.3d at 1348 (citation modified). "A civil plaintiff must also show (1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation." *Id.* (citation modified). Additionally, a plaintiff "can establish a RICO conspiracy claim by showing a [defendant] (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts." *In re Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d 1266, 1282 (S.D. Fla. 2021) (citing *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010)).

On its face, the elements of the two claims have nothing to do with any IDRE determination. The Plaintiff is not bringing any claims against the IDR process or the IDRE themselves but rather is asserting that the Defendants worked together to abuse the IDR process by overwhelming the system with submissions that they knew were ineligible for IDR. (*See* Am. Compl. ¶¶ 166, 168-69, 174-77, 179-84). By engaging in this fraud, the Defendants allegedly enriched themselves at the expense of the Plaintiff. (*See id.* ¶¶ 165, 167, 170, 172, 178, 185-86).

But if the Court reviews the Amended Complaint one level deeper, the

31

RICO claims reveal their true nature as a collateral attack upon the results of the IDR process. While the Defendants' allegedly fraudulent actions are the focus of the RICO claims, it is their use of the IDR process and the resultant IDRE determination that form the injury that the Plaintiff complains about. A key implication behind the asserted facts is that the IDR items and services are ineligible for IDR, but federal regulations require IDREs to make eligibility determinations as part of the IDR process. *See* 45 C.F.R. § 149.510(c)(1)(v). Additionally, the Plaintiff attacks the IDRE payment determination because it claims that the Defendants submitted inflated amounts as their offers under the IDR process. (*See* Am. Compl. ¶ 185). For the Court to evaluate whether the Defendants' conduct was fraudulent, the Court would have to inquire into both the IDRE's payment and eligibility determination and effectively second-guess the determination of the IDRE in each dispute. And a court cannot revisit legal or factual conclusions made by an arbitrator. *See Wiand*, 778 F.3d at 926.

Another key comes from the damages requested. Under RICO's private right of action, a plaintiff can only recover for damage to business and property. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025). In this case, the Plaintiff alleges business and property damage arising out of (1) money owed to the Defendants as a result of the IDR determinations, (2) time and money spent addressing and identifying ineligible IDR items or services, and (3) IDR

administrative fees paid. (*See* Am. Compl. ¶¶ 69, 99, 185-86). While this appears to be three separate categories that would not all be recoverable under an IDRE determination, the way the Amended Complaint was written gives the Plaintiff's game away.

Out of the three categories of damages, the Amended Complaint only lists dollar amounts for two of the categories, while neglecting to provide any information regarding the amount of time and money spent addressing and identifying ineligible IDR items or services. The Amended Complaint describes six specific IDR proceedings where the Plaintiff argues the IDR determination was erroneous and gives the Court a basis to understand the amount of damages it seeks from the Defendants for the alleged fraud they committed. (*See* Am. Compl. ¶¶ 140, 143, 146, 150, 156, 160). The Plaintiff made sure to provide information about the difference between the billed amount and the amount owed and also included how much it paid as to IDR fees. (*Id.*). The Amended Complaint also explains how much IDR administrative fees tend to amount to for each IDR proceeding within the Amended Complaint. (*Id.* ¶ 69). Ultimately, the Plaintiff describes that, in total, the Defendants "illicitly secured nearly $6 million in improper IDR awards" and "obligated BCBSGA to pay over $900,000 in unnecessary IDR-related fees." (*Id.* ¶¶ 113-14).

In contrast, the pleadings lack almost any detail as to the cost to the Plaintiff for its efforts in identifying ineligible IDR items or services. (*See id.*

33

¶ 99). Even within Counts 1 and 2, the Plaintiff makes no reference to this expense category. While the Court acknowledges doing so is not necessary to adequately plead that certain damages did occur for a federal claim, the Court still notes this discrepancy when ascertaining whether the claims amount to a collateral attack on the IDR award. The great majority of the expenses to the Plaintiff, as alleged in the Amended Complaint, arise out of IDR awards and associated fees to the Defendants. (*See id.* ¶¶ 113-14). The non-refundable administrative fees the Plaintiff seek to recover, in comparison, only amount to $115 per dispute initiation. (*Id.* ¶ 69). Accordingly, it is overwhelmingly clear to this Court that the main purpose of the RICO claims is to collaterally attack the IDR awards.

Even if the Court were not to make this distinction, the Court looks back to the definition of a collateral attack: "[a] party collaterally attacks an arbitration award by seeking to reverse the outcome in the subsequent proceeding or alleging that the party was harmed by a wrongful act's impact on the award." *Vital Pharms.*, 528 F. Supp. 3d at 1303 (citation modified). The Plaintiff's claims squarely fall into both parts of this definition. Not only is the Plaintiff seeking a return of money owed under binding IDRE determinations, it also implicitly asserts that the IDRE made the wrong eligibility determination by accepting the Defendants' IDR initiation documents, and it is seeking return of the associated money. Indeed, if it were true that the items

34

and services were ineligible for IDR, then the IDRE would have rejected the filing, and the Plaintiff would not have had to pay the associated fees. But for the RICO claims to succeed, the Court would have to second-guess the decision of the IDREs. That is ultimately prohibited.

Therefore, because the Plaintiff intends to use its RICO claims to collaterally attack IDR awards against it and such claims would require the Court to review the findings of the IDRE, the Court finds these claims to be collateral attacks on the IDRE determinations. Accordingly, the Court does not have subject-matter jurisdiction over Counts 1 and 2 of the Complaint.

### ii.    Georgia RICO (Count 3)

Under Georgia's RICO statute, "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b). Additionally, it is "unlawful for any person to conspire or endeavor to violate [O.C.G.A. §§ 16-14-4(a) or 16-14-4(b)]." O.C.G.A. § 16-14-4(c). Similar to the federal RICO statute, Georgia's RICO statute allows a private plaintiff to seek treble damages as well as punitive damages. O.C.G.A. § 16-14-6(b). Because Georgia's RICO statute is modeled off the federal RICO statute, federal authority may supplement state case law when there is an absence of case law on any given topic. *See Wylie v. Denton*, 323 Ga. App. 161, 166 n.7 (2013); *Ruiz v. Sewon America, Inc.*, 766 F. Supp. 3d

35

1251, 1263 (N.D. Ga. 2025); *see also Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 n.1 (11th Cir. 2014) ("Thus, where a plaintiff fails to state a federal claim under a particular predicate, his state-law claim under that predicate will fail as well.").

Because the statutes are so similar against the same factual background, the Court reaches the same conclusion as it did for the federal RICO claims. The Plaintiff's Georgia RICO claim seeks the same damages and is premised on the Court reviewing the IDRE's eligibility and payment determinations. Thus, the Court must dismiss Count 3 for want of subject-matter jurisdiction.

### iii. State and Common-Law Damages Claims (Counts 4-8)

Under Counts 4-8 of the Amended Complaint, the Plaintiff asserts claims arising out of common law and statutory fraud, negligent misrepresentation, theft by deception, and civil conspiracy. (*See* Am. Compl. ¶¶ 202-41). Common law fraud requires proof (1) "that the defendant made the representations;" (2) "that at the time he knew they were false;" (3) "that he made them with the intention and purpose of deceiving the plaintiff;" (4) "that the plaintiff justifiably relied on such representations;" and (5) "that the plaintiff sustained the alleged loss and damage as the proximate result of their having been made." *Greenwald v. Odom*, 314 Ga. App. 46, 52 (2012). Negligent misrepresentation operates similarly, requiring proof of (1) "the defendant's

36

negligent supply of false information to foreseeable persons, known or unknown;" (2) "such persons' reasonable reliance upon that false information; and (3) "economic injury proximately resulting from such reliance." *Id.* (citation modified). Statutory fraud is the "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury." O.C.G.A. § 51-6-2(a). Theft by deception occurs when a person "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a). Finally, "[t]o recover damages based on a civil conspiracy, a plaintiff must show that two or more persons combined 'either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort.'" *McIntee v. Deramus*, 313 Ga. App. 653, 656 (2012). Under each of these counts, the Plaintiff seeks damages for past conduct by the Defendants through each IDR proceeding. (*See* Am. Compl. ¶¶ 211, 218, 225, 235, 241).

The facts underlying each of these claims are similar to those asserted within the RICO counts. Each claim seeks damages for the Defendants' misrepresentations during the IDR process by initiating IDR while knowing that the services and items are ineligible for IDR. But, like the RICO claims, for the great majority of the damages claimed, the Court must review and relitigate the IDR awards by determining whether those items were eligible in the first place. Accordingly, the Court finds that each of these claims amount

to collateral attacks against the IDR awards. Therefore, the Court will dismiss Counts 4-8 for want of subject-matter jurisdiction.

### iv.    ERISA (Count 11)

The Court now turns to the other federal claim within the Amended Complaint. The Plaintiff brings an ERISA claim for equitable relief against the Defendants seeking to enjoin the Defendants from initiating IDR (1) "without first properly initiating and engaging in open negotiations;" (2) "for beneficiaries of government program exempt from NSA requirements;" (3) "for services subject to Georgia's specified state law;" (4) "for services that BCBSGA denied and thus are not eligible for IDR; and" (5) "for services when [the] Defendants failed to comply with other NSA requirements such as the IDR batching rules and the cooling off period." (Am. Compl. ¶ 262).

ERISA allows certain private parties to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter . . . or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter." 29 U.S.C. § 1132(a)(3). The NSA has been codified as parallel amendments to three federal statutes with some variations within the Internal Revenue Code, ERISA, and the Public Health Service Act. *Jeffrey Farkas, M.D., LLC v. 1199SEIU Nat'l Benefit Fund*, 2026 WL 891659, at *2 n.5 (E.D.N.Y. Apr. 1, 2026) (citing 26 U.S.C. § 9816(c), then citing 29 U.S.C. § 1185e, then citing 42 U.S.C. § 300gg-111). This includes the

same limitation on judicial review as found in the Public Health Services Act. *See* 29 U.S.C. § 1185e(c)(5)(E)(i)(II); 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). The Plaintiff seeks to enforce the NSA through 29 U.S.C. § 1132(a)(3). (*See* Am. Compl. ¶¶ 258-59).

Several issues exist with the Plaintiff's attempt to do so. As discussed, the NSA amends ERISA and contains its own provision limiting judicial review of an IDRE's determination. *See* 29 U.S.C. § 1185e(c)(5)(E)(i)(II). This provision, like that found in the Public Health Services Act, limits judicial review of an IDRE determination except in four cases found under the FAA. *Id.* The Court has already concluded that this wording limits private action against an IDRE award unless the Plaintiff seeks to vacate the award alleging facts sufficient to fit one of the four FAA categories as discussed in *Guardian Flight I* and *Guardian Flight II*. Thus, assuming that the Plaintiff's ERISA claim challenges the IDRE's determination, the Court does not have subject-matter jurisdiction to review claims for equitable relief under ERISA because the NSA does not allow such a cause of action. It is for similar reasons that district courts across the nation that have addressed the issue have concluded that the NSA, as incorporated in ERISA, does not provide a plaintiff a right to equitable injunctive or declaratory relief. *See, e.g., Conn. Gen. Life Ins. Co. v. East Coast Advanced Plastic Surgery, LLC*, 2026 WL 518442, at *4, *7-9 (S.D.N.Y. Feb. 24, 2026) (denying equitable relief under several statutes,

39

including ERISA, because the NSA does not permit claims for equitable relief); *East Coast Advanced Plastic Surgery, LLC v. Cigna Health and Life Ins. Co.*, 2025 WL 2371537, at *17-18 (S.D.N.Y. Aug. 14, 2025) (denying declaratory relief under the NSA, as amended within ERISA, because the NSA does not create a private right of action outside of 29 U.S.C. § 1185e(b)(5)(E)).

The Court additionally finds that the Plaintiff's claims for injunctive relief require this Court to review IDRE determinations by a collateral attack. The Court has already concluded that an IDRE's decision as to the eligibility of a dispute is necessary to render a payment determination. And, when looking at the injunctive relief requested by the Plaintiff, it is dependent on facts alleging that the Defendants failed to adequately follow the IDR process. (*See* Am. Compl. ¶¶ 255-62). For the Court to provide injunctive relief to the Plaintiff under ERISA, the Court must review whether the Defendants previously complied with the requirements of the IDR process and determine whether specific items and services were actually eligible for IDR, something that has already been done by the IDRE before making the payment determination in each case. For the Court to grant the Plaintiff relief on this claim, the Court would have to ultimately conclude that the IDREs erred in their conclusion that the IDR items and services were, in fact, eligible for IDR.

It is irrelevant that ERISA provides a private right of action to enforce violations of the subchapter, which includes the NSA. *See* 29 U.S.C.

§ 1132(a)(3); 29 U.S.C. § 1185e. The NSA, which was codified after the statute providing a private right of action in ERISA, specifically exempts IDRE determinations from judicial review. *See* 29 U.S.C. § 1185e(c)(5)(E)(i)(II). The limitation in the NSA controls under two principles of statutory interpretation. First, when a conflict exists between the "broadly sweeping terms of a statute of general application that . . . apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, [a court] avoid[s] conflict between the two by reading the specific as an exception to the general." *ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc.*, 504 F.3d 1208, 1210 (11th Cir. 2007). Second, "where two statutory provisions would otherwise conflict, the earlier enacted one yields to the later one to the extent necessary to prevent the conflict." *Id.* Not only was the NSA enacted after ERISA, but the NSA's limitation on judicial review is also far narrower than the private right of action allowed through ERISA. Thus, this limitation can be read as an exception to the broad grant under 29 U.S.C. § 1132(a)(3). *See also Anthem Blue Cross Life and Health Ins. Co.*, 2026 WL 982629, at *10 (holding ERISA's "general jurisdictional language does not supplant the NSA's specific limitations on judicial review").

The Plaintiff also argues that its requests for injunctive relief do not amount to collateral attacks because it seeks to prevent future damages. (Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 31). It is true that the fact that the

41

Plaintiff seeks future-looking relief is a factor that cuts against a finding that the ERISA claim is a collateral attack. But *every other aspect* of the Plaintiff's claim can be characterized as a collateral attack. *Vital Pharms., Inc.*, 528 F. Supp. 3d at 1303 (quoting *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986)). The proper inquiry into whether a claim is a collateral attack is whether the claim "seek[s] to reverse the outcome in the subsequent proceeding or *alleg[e] that the party was harmed by a wrongful act's impact on the award.*" *Id.* at 1303 (citation omitted) (emphasis added). It is this second category where the Plaintiff's ERISA claim lies. The case or controversy brought to the Court arises out of multiple IDRE eligibility determinations. The Plaintiff's Amended Complaint plainly says as such. (Am. Compl. ¶ 261 ("There is an actual case and controversy between BCBSGA and Defendants relating to the claims fraudulently submitted and arbitrated as part of the NSA IDR process.")).

Thus, the Court does not have subject-matter jurisdiction over the ERISA claim for two reasons. First, the Plaintiff's ERISA claim for equitable relief amounts to a collateral attack on the IDR award. Second, the NSA, as incorporated in ERISA, does not provide the Plaintiff with a private right of action for declaratory or injunctive relief.

### v.    Georgia Deceptive Trade Practices Act (Count 9)

Finally, the Plaintiff asserts a claim for a violation of the Georgia Deceptive Trade Practices Act (the "GDTPA") against the Defendants. (*See*

Am. Compl. ¶ 242-49). Under this statute, the Plaintiff requests the Court to issue an injunction prohibiting the Defendants from making misrepresentations that certain items and services are eligible for IDR in violation of several provisions of the GDTPA. (*See id.*). The relevant provisions state:

> A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . . (5) [r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; . . . (7) [r]epresents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; . . . or (12) [e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

O.C.G.A. § 10-1-372(a). A plaintiff may only seek equitable relief and not money damages under the GDTPA. *Somerson v. McMahon*, 956 F. Supp. 2d 1345, 1358 (N.D. Ga. 2012) (quoting and citing *Akron Pest Control v. Radar Exterminating Co., Inc.*, 216 Ga. App. 495, 498 (1995)).

Similar to the Plaintiff's ERISA claim for injunctive relief, the Court concludes that the Plaintiff's GDTPA claim amounts to a collateral attack. Like the ERISA claim, determining whether the Defendants made false representations requires the Court to revisit the factual determinations made by IDREs in previous disputes. By enjoining such practices, the Plaintiff alleges previous wrongdoing by the Defendants and by extension, the IDREs,

43

as the actual monetary damage alleged arises from the IDRE determinations and the IDR process. (*See* Am. Compl. ¶¶ 248-49).

Thus, the Court lacks subject-matter jurisdiction over Count 9 of the Amended Complaint. Accordingly, this leaves the Plaintiff's claim for vacatur as the only remaining Count within the Amended Complaint not dismissed by this Court at this stage.

## B. Personal Jurisdiction

Defendant HaloMD also brings a Rule 12(b)(2) motion to dismiss the Amended Complaint, arguing that the facts within the Amended Complaint do not establish that the Court has personal jurisdiction over it. (*See* Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 17-20). "When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, Rule 4(e) of the Federal Rules of Civil Procedure requires that both assertion of jurisdiction and service of process be determined by state amenability standards, or the state long-arm statute." *Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). Accordingly, a federal court must engage in a two-part analysis to determine whether the plaintiff has adequately alleged facts sufficient to confer personal jurisdiction. First, a federal court "must examine the jurisdictional issue under the state long-arm statute." *Id.* Second, the court "must ascertain whether or not sufficient 'minimum contacts' exist to satisfy the Due Process Clause of the

44

Fourteenth Amendment so that 'maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.''' *Id.* (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

Because the Court sits in Georgia, the Court examines the Georgia long-arm statute first. Relevant to this matter, Georgia's long-arm statute permits Georgia courts to exercise personal jurisdiction over nonresidents if the nonresident "transacts any business within this state." O.C.G.A. § 9-10-91(1). Georgia courts interpret this subsection broadly, and as long as "any business" is conducted in the state by a nonresident, through tangible or intangible contacts, there will be personal jurisdiction over that nonresident. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1261 (11th Cir. 2010) (citing *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa*, 279 Ga. 672, 675-76 (2005)).

Though the Georgia Supreme Court has interpreted its long-arm statute broadly in *Innovative Clinical*, Georgia courts recognize that limits still do exist on the exercise of the long-arm statute. *Cascade Aircraft Management., LLC v. Velazco*, 374 Ga. App. 397 (2025), is instructive on this issue. There, the Velazcos, who were residents of Georgia, purchased a kit from a defendant located in Oregon which consisted of parts and instructions for constructing an experimental amateur-built aircraft. *Id.* at 398. Two years after the plaintiffs' plane was assembled, one of the Velazcos emailed another defendant, an

45

aircraft and repair facility located in Idaho, regarding issues with the plane and the defendant agreed to repair it. *Id.* During the repairs, the repair facility defendant regularly updated the Velazcos on the progress of the repairs over e-mail and sent the Velazcos 13 invoices for the ongoing repairs. *Id.* After the repairs were made, a defect in the repairs resulted in the death of the Velazcos, and the surviving children of the Velazcos brought suit for wrongful death. *Id.* at 397, 399.

The repair facility defendant challenged the court's personal jurisdiction over it, arguing that it provided only a site-specific service outside of the state. *Id.* at 399. On appeal, the appellate court considered whether the repair facility defendant transacted business sufficient under O.C.G.A. § 9-10-91(1) to confer personal jurisdiction. *Id.* at 401. The court explained that personal jurisdiction only exists on the basis of transacting business in the state if (1) "the nonresident defendant has *purposefully done some act or consummated some transaction in this state*," (2) "the cause of action arises from or is connected with such act or transaction," and (3) "the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice." *Id.* at 402 (quoting *Amerireach.com v. Walker*, 290 Ga. 261, 269 (2011)) (emphasis in original). The appellate court also noted that, for the purposes of personal jurisdiction analysis, Georgia courts have drawn a "'critical distinction between manufacturers and sellers of a physical product and persons or

46

entities that . . . provide a site-specific service, even if such service involves or relates to products that will travel to Georgia.'" *Id.* (citation omitted).

Applying these rules to the repair facility defendant, the court noted that the defendant (1) was incorporated in Pennsylvania; (2) had its sole place of business is in Idaho; (3) never had any offices or property in Georgia; (4) never had any employees reside in Georgia; (5) did not have a registered agent in Georgia; and (6) never repaired any planes in Georgia. *Id.* Additionally, the court made sure to note certain facts that showed that the repair facility defendant *never purposefully initiated contact* with Georgia residents. *See id.* at 404-05. Specifically, the repair facility defendant advertised online solely through an informational website and never directed its advertising or any marketing efforts toward Georgia. *Id.* at 404. Also, the repair facility defendant never initiated the contact with the Velazcos about repairing their plane and did not actively seek out their business or any business in Georgia. *Id.* The appellate court found these facts compelling under both Georgia and Supreme Court precedent, since the Velazcos reached out first to the defendant and a website alone is insufficient to establish personal jurisdiction. *Id.* at 404-05 (citing *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014), then citing *Intercontinental Servs. Of Del., LLC v. Kent*, 343 Ga. App. 567, 576 (2017)). Ultimately, because the case involved a "single, isolated transaction with Georgia residents for a site-specific out-of-state service, which did not

47

place a product in the stream of commerce to Georgia or to any other state," the court reversed the trial court's denial of the repair facility defendant's motion to dismiss for lack of personal jurisdiction. *Id.* at 408-09.

Here, Defendant HaloMD solicits and represents many different types of out-of-network providers who retain Defendant HaloMD to administer the IDR process on their behalf. (*See* Am. Compl. ¶ 121). Because Defendant HaloMD provides a service to the Provider Defendants, as opposed to a product, the Court performs a similar analysis to the court in *Cascade Aircraft Management.* According to the Amended Complaint, Defendant HaloMD is incorporated in Delaware and has its principal place of business in Addison, Texas. (*Id.* ¶ 12). The Plaintiff only makes two allegations as to the issue of personal jurisdiction within its Amended Complaint. First, the Plaintiff contends that Defendant HaloMD "solicits and represents physician practices throughout the United States, including in Georgia." (Am. Compl. ¶ 12). Second, the Plaintiff alleges that Defendant HaloMD has initiated disputes on behalf of the Provider Defendants, who are located in Georgia. (*See id.* ¶¶ 13, 14, 130).

The Court concludes that these two allegations are insufficient to establish a prima facie case of personal jurisdiction under Georgia's long-arm statute under *Cascade Aircraft Management.* The factual allegations within the Amended Complaint fail to establish a prima facie case that Defendant

HaloMD purposefully initiated contact with Georgia for the purpose of engaging in business in Georgia. *See Cascade Aircraft Mgmt.*, 374 Ga. App. at 404-05. The fact that Defendant HaloMD had clients in Georgia is not enough to establish this element of Georgia's long-arm statute. This is because the Amended Complaint lacks several crucial pieces of information necessary to make the determination of whether personal jurisdiction exists over Defendant HaloMD. Specifically, the Amended Complaint lacks (1) how many clients Defendant HaloMD has in Georgia, (2) whether it performs any of its services within Georgia, (3) whether it has any employees or offices in Georgia, (4) whether it has a registered agent in Georgia, (5) how it solicited clients in Georgia, (6) whether it makes initial contact with potential clients, including the Provider Defendants, before creating a business relationship, and (7) whether it has purposefully made business contacts in any other way. Additionally, the Plaintiff's response brief lacks any clarification on any of these issues. [3] This information is important to the personal jurisdiction

---

[3] The Plaintiff focuses its entire response to personal jurisdiction on the nationwide service of process permitted by RICO and ERISA. (*See* Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 19-20). Generally, where a federal statute permits nationwide service of process, it becomes the statutory basis for personal jurisdiction. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). But in this case, both the RICO and ERISA claims have been dismissed for lack of subject matter jurisdiction. Accordingly, neither basis can provide personal jurisdiction over Defendant HaloMD.

analysis because it matters whether Defendant HaloMD or its clients solicited the business relationship first. *See Cascade Aircraft Mgmt.*, 374 Ga. App. at 406-07.

Without this information, the Court notes several pieces of information that cut against the Plaintiff's argument for personal jurisdiction. First, the Plaintiff directs the Court to certain provisions of Defendant HaloMD's website. (*See* Am. Compl. ¶¶ 120, 122-23, 125). But nowhere in Defendant HaloMD's website, nor in the Plaintiff's allegations, is there any evidence that Defendant HaloMD specifically solicits clients from Georgia, rather than nationally. (*See id.*); *see generally* HaloMD, halomd.com (last visited June 2, 2026). Second, and as to Defendant HaloMD's relationship with the Provider Defendants, the Amended Complaint notes that both Defendant HaloMD and Sound Physicians initiated IDR disputes for the Provider Defendants. (*See* Am. Compl. ¶¶ 130-31). But the Amended Complaint fails to show how many are initiated by Defendant HaloMD in the first place. Instead, the Amended Complaint notes that "many IDRs pursued by the Provider Defendants were initiated by Sound Physicians," which implies that Defendant HaloMD did not have much contact with Georgia. (*See id.* ¶ 131). Third, in detailing the Sound Physicians Enterprise, the Plaintiff largely concedes that Defendant HaloMD has little contact with Georgia. In describing the path of the purported wires, the Plaintiff explains that the wire flows from the state in which the

50

Defendants operate (which would be Texas for Defendant HaloMD) to IDREs, none of which are located in Georgia. (*See id.* ¶ 133).

To be clear, a plaintiff is not required to provide all of the missing information noted by the Court in order to satisfy Georgia's long-arm statute. Instead, the Court notes several ways in which the Plaintiff could have established personal jurisdiction over Defendant HaloMD under the "transacts business" prong of Georgia's long-arm statute. Because the Plaintiff provided almost no information to establish this prima facie case, and because the Plaintiff's own facts cut against a finding of personal jurisdiction, the Court ultimately concludes that Georgia's long-arm statute fails to confer personal jurisdiction over Defendant HaloMD.

## C. Failure to State a Claim

As part of their 12(b)(6) motions, the Defendants argue for dismissal of the Amended Complaint for two reasons. First, the Defendants argue that the Plaintiff's Amended Complaint constitutes a shotgun pleading. (Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 55; *see* Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 45). Second, the Defendants argue that the Plaintiff fails to state a claim for vacatur, the only remaining count in the Amended Complaint. (Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 28-35; *see* Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 40-42).

### 1. Shotgun Pleading

"A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (citation omitted). "Shotgun pleadings are flatly forbidden by the spirit, if not the letter, of these rules because they are calculated to confuse the enemy, and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked." *Id.* (citation modified). There are four rough categories of shotgun pleadings. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). The category relevant to this action is "the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323.

The Defendants argue that the Court should dismiss the Amended Complaint as a shotgun pleading on this ground. (Br. in Supp. of Provider Defs.' Mot. to Dismiss, at 55; *see* Br. in Supp. of Def. HaloMD's Mot. to Dismiss, at 45). The Court disagrees. "A dismissal under Rules 8(a)(2) and 10(b) is appropriate where it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Weiland*, 792 F.3d at 1326 (citation modified). No such virtual impossibility exists here.

52

Throughout the Amended Complaint, the general facts detail most of what the Defendants must know to defend each claim. When explaining the fraudulent scheme, the Plaintiff divides each group of Defendants separately within the enterprise and explains their role in the overall wrongdoing. (*See* Am. Compl. ¶¶ 115-32). Furthermore, the Amended Complaint details six IDR proceedings and explains which of the Defendants was involved in each proceeding. (*See id.* ¶¶ 135-60). In effect, the reason why the Amended Complaint does not detail which Defendants are involved in each claim is because all Defendants are responsible for their respective roles. The Plaintiff has identified them sufficiently. Therefore, the Court finds no reason to dismiss this Amended Complaint as a shotgun pleading. *See Farr v. CTG Hosp. Grp.*, 2026 WL 613036, at *3-4, *20-21 (N.D. Ga. Mar. 4, 2026) (holding that a complaint was not a shotgun pleading despite its poor formatting, length, and repetition of facts that rendered the complaint over five-hundred paragraphs long because, in part, the plaintiff identified the role of each defendant adequately).

### 2.  Vacatur (Count 11)

The Court now turns to the remaining count in the Amended Complaint. In order for the Plaintiff to state a claim for vacatur under the NSA, the factual allegations must arise out of one of four categories: (1) "the award was procured by corruption, fraud, or undue means;" (2) "there was evident partiality or

corruption in the arbitrators;" (3) "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced;" or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *See* 9 U.S.C. §§ 10(a)(1)-(4); 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

Despite the incorporation of these categories into the NSA, the terms used within these categories in the FAA retain their meaning as interpreted by this Circuit. *Reach Air Med. Servs.*, 160 F.4th at 1118. This is because, "when Congress adopts a new law that incorporates sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.* (citation modified). Furthermore, "when administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Id.* (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (citation modified)). Accordingly, the Court will apply existing interpretations of each category under the FAA and determine whether each of the Plaintiff's claims fit under this framework. But, as discussed in the

54

Court's analysis of subject-matter jurisdiction, the Court will not apply the procedural requirements under the FAA with regard to a petition for vacatur. *See* Discussion III.A(2)(b), *supra*, at 27-28.

Turning to the Plaintiff's Amended Complaint, the Court need not analyze all four categories. Under the Plaintiff's claim for vacatur, the Plaintiff only asserted that the underlying facts met two of the four categories for vacatur: (1) fraud and undue means and (2) that the IDREs exceeded their authority. (*See* Am. Compl. ¶¶ 250-54); *see* 9 U.S.C. §§ 10(a)(1), (4).[4] In any case, the alleged facts do not sufficiently state a claim to argue that the IDREs were partial or that they committed any misconduct. Furthermore, there are no factual allegations that the IDREs engaged in any corrupt behavior that affected their rights. Thus, the Court will focus its analysis on whether the Plaintiff adequately alleges facts sufficient to show fraud or that the IDREs

---

[4] In the Plaintiff's surreply brief, the Plaintiff argues that the Amended Complaint states a claim that the "the [IDREs] were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced." (Pl.'s Surreply Br. in Opp'n to Defs.' Mots. to Dismiss, at 5 [Doc. 74]); *see* 9 U.S.C. § 10(a)(3). This is the first time the Plaintiff affirmatively invokes this subsection as a basis for their vacatur claim. Not only is there no mention of this subsection under Count 10 of the Amended Complaint, but there is also no affirmative mention of the subsection within the Plaintiff's response briefing. It is a well-established rule that "arguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (citation modified). The Court declines to address the argument for this reason.

exceeded their authority.

### a.  § 10(a)(1): Fraud and Undue Means

Under the NSA, judicial review of an IDRE determination is permitted where a plaintiff adequately pleads that an "award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1); 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). The Eleventh Circuit addresses the issues of fraud and undue means separately. *See Reach Air Med. Servs.*, 160 F.4th at 1121-24. The Court does here as well.

### i.  Fraud

To state a claim for fraud, the Eleventh Circuit applies a three-part test: (1) "'[t]he movant must establish the fraud by clear and convincing evidence;'" (2) "'the fraud must have not been discoverable upon the exercise of due diligence prior to or during the arbitration;'" and (3) "'the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration.'" *Reach Air Med. Servs.*, 160 F.4th at 1121 (citation omitted).

To establish fraud by clear and convincing evidence, a plaintiff must satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *Id.* Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be

56

alleged generally." Fed. R. Civ. P. 9(b). As interpreted by this Circuit, Rule 9(b):

> plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making . . . them; (3) the content of such statements and the manner in which they misled the [IDRE]; and (4) what the defendant obtained as a consequence of the fraud.

*Reach Air Med. Servs.*, 160 F.4th at 1121.

On this first prong, the Plaintiff argues that it has adequately pled fraud through allegations that the Defendants made false attestations of IDR eligibility. (Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 29). The Court emphatically disagrees under Rule 9(b). This is partly because the Plaintiff seeks vacatur of thousands of IDR determinations based on general allegations. (*See* Am. Compl. ¶ 112). Out of these thousands, the Plaintiff only makes somewhat detailed allegations about six of these proceedings. (*See id.* ¶¶ 135-60). Whether it be the factual allegations underlying those six proceedings or those supporting the remaining thousands, the Plaintiff fails to satisfy Rule 9(b).

For example, the Court looks to the portion of the Amended Complaint that alleges that the Defendants knowingly made false attestations of eligibility to initiate the IDR process. (*See id.* ¶¶ 74-89). In an attempt to summarize thousands of misrepresentations, the Plaintiff lists several reasons why the items submitted for IDR could be ineligible and its effort to let the

57

Defendants know of this fact for each IDR proceeding prior to the arbitration. (*Id.* ¶¶ 74, 79-84). This showing alone is not enough to satisfy the requirements of Rule 9(b).

First, the Plaintiff fails to show precisely *what* statements or omissions were made by the Defendants to the IDRE and the content of those statements. Within the Amended Complaint, the Plaintiff acknowledges that the attestations through the IDR Portal require the entry of certain information that is more than simply checking off a box. Not only does a user of the IDR Portal agree to terms and conditions, but he or she must also answer certain "Qualification Questions" to determine an item or service's eligibility for IDR and attest to the accuracy of those responses. (*Id.* ¶¶ 48-55). It is at this point where the misrepresentations begin according to the Plaintiff. (*Id.* ¶¶ 79-89). While the pleadings show us where the misrepresentations are submitted, the Plaintiff has not explained what erroneous information was entered into the IDR Portal to mislead the IDRE in the first place, outside of vague assertions. *See Reach Air Med. Servs.*, 160 F.4th at 1122 (finding that certain statements lacked specificity to allege fraud under Rule 9(b) because the complaint did not provide further details about how the representation was made and whether such representations were on the same or different documents); *Hagerma v. Wells Fargo Advisors Fin. Network LLC*, 2026 WL 874172, at *3 (M.D. Fla. Mar. 31, 2026) ("[The plaintiff] refers vaguely to 'fraud perpetrated by the

58

opposing party' . . . He does not specify the statement or omission that qualifies as 'fraud,' and thus his argument fails for lack of specificity alone." (citation omitted)).

Second, the Plaintiff largely omits the time at which the Defendants made each misrepresentation. While the Plaintiffs loosely allege that the conspiracy between the Defendants began "no later than January 2024," (Am. Compl. ¶ 72), Rule 9(b) requires the time and place to be alleged *for each statement. See Reach Air Med. Servs.*, 160 F.4th at 1121. The Plaintiff fails to do so here. *See id.* at 1122 ("It says only that the EOB was issued on April 21, 2022. The Complaint does not . . . allege the time of the second statement, only that Kaiser submitted a different and lower QPA").

Third, the Plaintiff omits which Defendant made each fraudulent misrepresentation for each IDR proceeding. The Amended Complaint contains only vague allegations of which individual initiated each proceeding. This is important here because it is not clear which Defendant filed each IDR proceeding since both Defendant HaloMD and Sound Physicians initiated IDR proceedings on behalf of the Provider Defendants. (*See* Am. Compl. ¶¶ 130-31). Further, under the allegations of the Amended Complaint, both parties were responsible for fraudulent misrepresentations. (*See id.*). Thus, it becomes necessary to specify which Defendant made which misrepresentation under Rule 9(b).

59

Fourth, the Plaintiff fails to adequately allege facts that show how the representations misled the IDRE. Indeed, the Plaintiff itself admits that it had the opportunity to object or otherwise respond to the Defendants' misrepresentations during specific IDR proceedings. (*See id.* ¶¶ 142, 145, 149, 155, 159). It follows that this option exists in all IDR proceedings for the Plaintiff and that it can fairly supplement missing information to the IDRE where the Defendants misrepresent certain facts.

To this point, the Plaintiff argues that it has made an adequate showing because, despite its opportunity to object, the Amended Complaint shows no indication that "the arbitrators had all the material information before them" and actually addressed the disputed misrepresentation. (Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 29). It also argues that the IDREs did not issue written eligibility decisions, much less decisions addressing any fraud claims. (*Id.*). But it is well-settled in this Circuit that an arbitrator need not issue a written opinion and that the decision itself is enough. *Reach Air Med. Servs.*, 160 F.4th at 1120 (citation omitted). It also makes little sense for the Court to question whether the IDRE had all the material information before them when the Plaintiff had the opportunity to object and be heard by the IDRE on the issue of eligibility. Thus, the Amended Complaint fails to meet the strict pleading standards of Rule 9(b) in order to allege fraud. *See id.* at 1122 (holding that the plaintiff failed to meet Rule 9(b) to allege fraud, in part, because

60

"Reach was not misled by Kaiser's figure at all")

The six IDR proceedings described in detail in the Amended Complaint also meet this same fate. To be clear, the Plaintiff could satisfy the requirements of Rule 9(b) to the extent of explaining (1) when the misrepresentations were made, (2) who made the misrepresentations, and (3) the content of the specified misrepresentations. For example, the Court looks at IDR Proceeding DISP-1317978 to illustrate. (*See id.* ¶¶ 135-40). The pleadings show that, in order to initiate IDR proceedings, an individual must answer certain Qualification Questions and attest to the accuracy of those statements. (*Id.* ¶¶ 48-55). Accordingly, the Plaintiff alleges that IDR was initiated on May 9, 2024, implying that those questions had been answered on the IDR Portal. (*Id.* ¶ 138). The Plaintiff explains that HaloMD answered those questions on behalf of the Provider Defendants. (*Id.*). The Plaintiff also alleges that HaloMD made two false representations as to the eligibility of the items for IDR as the services were rendered to a Medicaid member and the claim was time-barred. (*Id.*).

Nonetheless, the IDR proceedings fail to meet Rule 9(b) because the Plaintiff cannot show how the misrepresentations misled the IDRE like the other thousands of IDR proceedings. In fact, the reasoning is far stronger here than in the thousands of IDR proceedings. For the six proceedings, the Plaintiff had the opportunity to object and make its case for why the Defendants'

61

representations were incorrect. (*See id.* ¶¶ 142, 145, 149, 155, 159). Nonetheless, after hearing the arguments, the IDRE still made the Plaintiff pay amounts to the Defendants, implicitly holding there to be eligibility in five of the disputes and explicitly holding as such in one of the disputes. (*See id.* ¶¶ 139, 143, 146, 150, 156, 160). Accordingly, the Plaintiff fails to show how the Defendants' misrepresentations misled the IDRE. Because the Plaintiff cannot show by clear and convincing evidence that the Defendants committed fraud in any of the IDR proceedings, the Plaintiff cannot seek vacatur under the NSA on the basis of fraud. *See also Anthem Blue Cross Life and Health Ins. Co.*, 2026 WL 982629, at *7-8 (holding, following Ninth Circuit precedent and confronted with similar facts, that the plaintiff "pleaded itself out of court" for vacatur based on fraud because the "fraud" was known during the IDR and disclosed to the IDRE).

The Court notes that the Plaintiff argues that it loses a lot of IDR arbitrations. For example, it says that of the 228 IDRs the Defendants initiated on May 3, 2024, the Plaintiff lost 192. It cites CMS data that Providers prevailed in 85% of IDR payment determinations. It is highly improbable to infer from these facts that there is a vast conspiracy of providers and IDREs that have conspired to defraud the Plaintiff of millions of dollars in thousands of NSA IDR proceedings over many years. It is highly plausible to infer that the Plaintiff engages in a consistent practice of submitting lowball offers to

out-of-network providers in an effort to maximize its profits. This conclusion is reinforced by the generality and conclusory nature of the Plaintiff's fraud claims and failure to comply with Rule 9(b) as noted above.

### ii. Undue Means

To state a claim that a defendant procured an arbitration award through undue means, a plaintiff must allege facts adequate to sustain an action "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator or other improper influence." *Reach Air Med. Servs.*, 160 F.4th at 1123-24 (citation modified). The Plaintiff fails to do so here. The Amended Complaint alleges minimal facts that convince the Court that there was any improper influence on the IDREs. All the Plaintiff alleges to this prong is that, under the NSA, the IDREs have a financial incentive not to dismiss disputes for ineligibility and that the Defendants exploit this flaw in the system by misrepresenting eligibility. (*See* Am. Compl. ¶ 100).

It is difficult to argue how even the misuse of a mechanism to compensate IDREs prescribed by the NSA is tantamount to undue means on the level of "physical threat to an arbitrator." *See Reach Air Med. Servs.*, 160 F.4th at 1124 (clarifying that the allegations must meet undue means on the level of "physical threat to an arbitrator"). And it is not even to the level of allegations putting forth "bad faith or bribery." *See Anthem Blue Cross Life and Health Ins. Co.*, 2026 WL 982629 at *8 (clarifying that the allegations must

63

meet undue means on the level of "bad faith or bribery). In any case, even if any misrepresentations were presented to the IDREs, the Plaintiff had ample opportunity to object prior to an eligibility determination. (*See id.* ¶¶ 142, 145, 149, 155, 159). And the NSA and corresponding federal regulations contain procedures to ensure the neutrality of the IDREs prior to the initiation of any dispute, allowing any party to object to the selection of a certain IDRE. *See* 42 U.S.C. § 300gg-11(c)(4)(F); 45 C.F.R. § 149.510(c)(1). If the Plaintiff is unhappy as to the system in place within the federal statute, Congress can provide the remedy, not the Defendants or the Court. Accordingly, the Plaintiff fails to allege sufficient facts to allege that the IDR award was procured by undue means.

### b. § 10(a)(4): Exceeding IDRE Authority

"Under Section 10(a)(4), an arbitration award may be unenforceable, but only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Reach Air Med. Servs.*, 160 F.4th at 1119 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (citation modified)). "While a federal court may vacate an arbitration award when it exceeds the scope of the arbitrator's authority, few awards are vacated because the scope of the arbitrator's authority is so broad." *Id.* (citation modified). "It is not enough to show that the arbitrator committed an error—or even a serious error." *Id.* at 1119-20 (quoting

64

*Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (citation modified)). "Rather, only if the arbitrator acts outside the scope of his authority—issuing an award that simply reflects his own notions of economic justice—may a court overturn his determination." *Id.* at 1120 (quoting *Oxford Health Plans*, 569 U.S. at 569 (citation modified)). A court's sole question under Section 10(a)(4) is "whether the arbitrator (even arguably) performed the assigned task, not whether she got the outcome right or wrong." *Id.* (citation modified).

The Eleventh Circuit has only recognized a few examples of instances in which an arbitrator exceeds his authority under Section 10(a)(4):

> awarding relief on a statutory claim when the arbitration agreement allows only for arbitration of contractual claims, *see Paladino v. Avnet Comput. Techs., Inc.*, 134 F.3d 1054, 1061 (11th Cir. 1998); failing to give preclusive effect to an issue already (and properly) decided by a court, *see Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997); and forcing a party to submit to class arbitration without a contractual basis for concluding that the party agreed to it, *see Stolt-Nielsen*, 559 U.S. at 684.

*Reach Air Med. Servs.*, 160 F.4th at 1120 (citation omitted).

The Plaintiff argues that, under Section 10(a)(4), the IDREs exceeded their powers by resolving disputes that were ineligible for IDR since the NSA only permits IDREs to issue payment determinations for a qualified IDR item or service. (Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 28-29). It argues that, by making payment determinations on ineligible items and services, the

65

IDREs made determinations on items that they lacked the authority to decide. (*Id.* at 29). The argument lacks merit. The federal regulations corresponding to the NSA explicitly grant IDREs the right to make determinations as to whether IDR items and services are eligible under the NSA. *See* 45 C.F.R. § 149.510(c)(1)(v). It follows, then, that the IDREs have the power to determine their own jurisdiction and continue to make a payment determination.

It is irrelevant whether the Plaintiff makes allegations that the items were ineligible for IDR as the IDRE (1) reviewed the Defendants' submissions, (2) took into account the Plaintiff's objections, (3) made a jurisdictional determination, then (4) made a payment determination, as procedurally required. The sole question is whether the IDREs performed the task. *Reach Air Med. Servs.*, 160 F.4th at 1120. The factual allegations show that they did. Because it is not the role of the Court to determine whether a jurisdictional determination is right or wrong, the Court concludes that the Plaintiff fails to state a claim for vacatur under Section 10(a)(4). Accordingly, Count 11 is dismissed.

### D. Leave to Amend

Generally, the dismissal of a complaint with prejudice bars a plaintiff from amending his pleadings and from pursuing the same action against the same defendants. *See McNair v. Johnson*, 143 F.4th 1301, 1306 (11th Cir. 2025) (explaining the consequences of a dismissal without prejudice).

"Dismissal with prejudice is proper when a more carefully drafted complaint would not state a claim for relief." *Arthur v. JP Morgan Chase Bank*, NA, 569 F. App'x 669, 686 (11th Cir. 2014).

District courts have discretion in determining whether to allow a plaintiff to amend his pleadings. *See Pinnacle Advert. and Mktg, Grp., Inc. v. Pinnacle Advert. and Mktg. Grp., LLC*, 7 F.4th 989, 999-1000 (11th Cir. 2021) (stating that the standard of review for a district court's decision to grant leave to amend is abuse of discretion); *but see Eiber Radiology, Inc. v. Toshiba America Medical Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) (noting that a district court's discretion to dismiss a complaint without leave to amend is "severely restricted" by Federal Rule of Civil Procedure 15(a)(2), which requires leave to amend be freely given when justice so requires). The Eleventh Circuit generally encourages district courts to exercise their discretion in favor of allowing plaintiffs to amend their pleadings. *Id.* at 1000.

Here, the Plaintiff requests leave to amend its factual allegations to cure any deficiencies present within their Amended Complaint. (*See* Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 73-74). But justice is not served by prolonging the inevitable. The dismissal of claims for lack of subject-matter jurisdiction is largely premised on their character as collateral attacks on the IDRE determinations, no matter whether the Plaintiff sought damages or equitable relief. No additional modifications will imbue life into these claims.

67

Similarly, the Plaintiff cannot revive the vacatur claims against the Defendants. Although the Plaintiff *could* supplement specific facts that could satisfy portions of the Rule 9(b) standard to plead fraud, the Plaintiff pled itself out of Court by acknowledging that it had the opportunity to object to these misrepresentations before the IDRE. No supplementation of facts changes this admission. As to its failure to state claims for the remaining categories, there is no indication that the Plaintiff could supplement the facts provided in the Amended Complaint. This is most apparent from the fact that the Plaintiff's response brief lacks any mention of undue means as a ground for vacatur and summarizes its argument for "exceeds authority" in a single paragraph. (*See* Pl.'s Br. in Opp'n to Defs.' Mots. to Dismiss, at 28-29). Accordingly, the Amended Complaint will be dismissed with prejudice because amendment is futile.

## IV.   Conclusion

For the foregoing reasons, the Provider Defendants' Motion to Dismiss [Doc. 45] and Defendant HaloMD's Motion to Dismiss [Doc. 47] are GRANTED. The Amended Complaint is dismissed with prejudice for the reasons stated in this Order. The Clerk is directed to enter judgment in favor of the Defendants and close the case.

SO ORDERED, this ___10th___ day of July, 2026.

THOMAS W. THRASH, JR.
United States District Judge

69